(Decided March. 4th, 1864.)

---

JAMES C. ADAMS vs. FRANCIS B. CAPRON AND EDWARD SNOWDEN, TRADING AS CAPRON & COMPANY.

PRINCIPAL AND AGENT: CONSIGNOR AND CONSIGNEE—THEIR RELATIVE RIGHTS AND LIABILITIES.—A. of Baltimore consigned goods for sale to H. & Co. of London, and advances upon the consignments were made by C. & Co. of Baltimore, to the consignor, upon the undertaking of the latter to refund any excess of the advances over the net sales of the consignments. The advances were made by drafts of C. & Co. upon the consignees, which were paid by the latter, upon the undertaking of C. & Co. to refund

the amount overdrafted. The net sales proved insufficient to cover the advances;—upon an action by C. & Co. against the consignor to recover the amount over-drawn; HELD:

1st. That if H. & Co. performed their duties as consignees or agents with due care and skill, they had the right to be reimbursed to the full amount of their advances, and might assert that right against the consignor as their principal, (giving him credit for the proceeds of his consignments,) or against C. & Co., upon their undertaking of liability; and that the consignor might be required to refund to either of these parties, although he could be compelled to make but one satisfaction.

2nd. That if there was negligence or misconduct on the part of the consignees by which the consignor sustained loss or damage, their right, as well as that of C. & Co. to recover the excess of advances over the proceeds of the consignment, at most was only a qualified one, and the consignor might rely upon such negligence or misconduct as a defence to any claim that either of them could make on that ground.

3rd. That the liability of C. & Co. to the consignees, was the true measure or standard of their rights against the consignor.

4th. That C. & Co. became liable to an action on their contract to the consignees upon a rendition of the account of sales showing the amount over-drawn, and a right of action then accrued to C. & Co., upon the consignor's promise to pay them, subject, nevertheless, to such defences as he could make on the ground of negligence or misconduct on the part of the consignees.

5th. Where a consignment is made without any restriction, and the consignees are authorized by the consignors *to deal with it as their own*, the latter will not be entitled to notice from the consignees of its depreciated value before selling it.

PRAYERS AND INSTRUCTIONS TO THE JURY.—An instruction to the jury as to the plaintiff's right of recovery, founded upon an hypothesis of fact which takes from the jury the finding of other facts by which the right to recover may be impaired or defeated, is erroneous.

An instruction upon any given statement of fact, can only be had when the instruction asked is subordinate to, or in aid of a theory which embraces all the facts material to establish or defeat the right in controversy.

It is error in the Court to grant one instruction on the part of the plaintiff, and another on the part of the defendant, which are inconsistent with each other.

In such case it will not be sufficient that the proper instruction is given in one of the prayers, unless it be given in such terms as to impose a limitation upon the inconsistent and opposing theory of that offered by the adverse party.

EVIDENCE: WITNESS—EXAMINATION OF.—Where in the examination of a witness an objection was taken to a question, which objection the Court

could not sustain without assuming a fact about which there was a conflict of testimony; HELD:

That the Court was right in overruling the objection.

APPEAL from the Circuit Court for Howard County :

This suit was instituted by the appellees in March 1862. The declaration contained the common counts, and a special count, in the following terms: "For that the plaintiff, at several times prior to the 23rd of February 1860, advanced to the defendant, at his request, large sums of money, amounting in all to $6254.44, on a lot of beef, shipped from Baltimore to London, by the barque 'Emelia,' for sale; and the defendant, at the time of said advances, agreed with the plaintiff that if the amount which they should realize from the sale of said beef was less than the amount of said advances, that he, the said defendant, would, on the receipt of the account of said sales, refund the amount of said deficiency to the said plaintiff: that said sales were less than said advances, and though requested by the said plaintiff to refund said deficiency, the defendant hath failed and refused to do so."

*1st Exception.* The proof showed that the appellees, Capron & Co., merchants in the City of Baltimore, were correspondents of the house of F. Huth & Co., of London, the nature and terms of their business relations being contained in the following letter:

"LONDON, *3rd September*, 1858.

"MESSRS. CAPRON & Co., *Baltimore, Dear Sirs:* We have duly received your favor of the 17th ultimo, proposing an arrangement to facilitate operations on a footing similar to that which you have already made with our Liverpool house.

" Although we think that the class of business in question is not likely to answer so well for this port as for Liverpool, we are nevertheless disposed to make a trial on the same conditions as agreed upon between your good selves, and our friends in the latter place, that is to say, that we

are willing to accept your drafts on us at the usual sight against shipments of produce to our consignment, to the extent of two-thirds, or at most three-fourths, of the invoice cost, provided your prices are in proportion to ours, it being understood that such shipments are to be made under your guarantee, and that you remain responsible to us in case our advances are not covered by the net proceeds; bill of lading to be made out to our order with timely particulars for insurance, which we are to effect here; on all consignments we agree to return you one per cent. at the close of the year of our commission, which is $2\frac{1}{2}$ $\frac{0}{0}$ on cotton, and 4 $\frac{0}{0}$ on other produce.

"For the present, we do not wish that our advances should exceed £5,000, (five thousand pounds,) at any one . time, but we should be disposed to exceed that amount, hereafter if we find the business works satisfactorily. Hoping that this may prove to be the case,

"We remain, dear sirs, yours very truly,

"FRED'K HUTH & Co."

In February 1860, Capron & Co. induced Mr. Adams, the appellant, who was a beef packer in Baltimore, to ship to Huth & Co. 353 tierces of beef of his own curing and packing, and advanced thereon to said Adams the sum of $6,254.44, being the proceeds of several bills of exchange drawn by Capron & Co. on Huth & Co., which were duly paid by the latter. For the sums so advanced, Adams gave to Capron the receipt upon which this action was brought, and which is in the following terms:

"$409.83.—Received, Baltimore, 22d February 1860, of Capron & Co., four hundred and nine $\frac{83}{100}$ dollars, which, with $5,844.61 heretofore received, is $6,254.44 advanced on 353 tierces of beef shipped to London, per 'Emilia,' for sale for my account; and on receipt of account sales of same, *I promise to refund any deficiency that may arise therefrom.*

JAMES C. ADAMS."

The 353 tierces of beef mentioned in this receipt arrived in London on board the "Emilia," on the 23d of March 1860, consigned to Fred. Huth & Co., the bill of lading stating that it was shipped by James C. Adams, to be delivered to said F. Huth & Co., or their assigns.

On the 23d of February 1860, Adams wrote to Huth & Co., saying: "on the 13th inst. I consigned to you 353 tierces of beef, invoice of which you have at foot . . . . . I trust to your good management in its disposition; *do with it just as if it were your own.* . . . . . Messrs. Capron & Co. of this city have advanced me on the shipment, the proceeds of their drafts on you for £200, £600 and £500."

On the 2d of April 1860, Adams again wrote to Huth & Co., saying: "I am obliged for your attention and the care you design to give the beef—I will then know the character of the beef—but I am sorry to hear you say the market is dull; I want to get in the way of doing my own shipping, and in this instance I supposed (I believe Messrs. C. thought with me) the account sales, &c., would come direct to me, you deducting the £1,350, which I acknowledged having received from M. Capron & Co., my only object being as above intimated."

And on the 19th of July 1860, Adams writes to Huth & Co., saying: "I have none of your favors since 16th March, and begin to feel a little anxious about the beef, though I am sure you will effect sales to the best advantage."

On its arrival in London, the beef was inspected and found to be of an inferior quality, and the values put upon it by the appraiser there, were below what it was rated at in the invoices. The sales thereof were made at different dates, the first sale being on the 10th of August 1860, and the last on the 21st of October 1861, and the account of sales showed the amount advanced on the consignments to be largely in excess of the amount realized on the sales. Under a commission to London, evidence was taken to show that the beef sold for as much as it would bring, and at a fair and *bona fide* sale, and that the sales were made ac-

Adams *vs.* Capron, et al.

cording to the established and customary course of selling beef in the London market. That the quality and condition of the beef were poor, and it was badly manufactured. That from the time of its arrival up to the time of the sales, the market for such beef was in a very depressed state, and "fearfully overstocked," and buyers had their pick of the market, and it was almost impossible to obtain offers at all for any but the very first rate parcels. It was also proved, that in the month of April 1860, the beef was examined by Mr. Evans, one of the firm of Trimmer & Grainger, at the request of Huth & Co., and the result of the examination was very unfavorable; and that the said beef was sold at less rates than those at which the same was rated by the Messrs. Trimmer and Grainger, because no buyers could be found for higher prices than those which the said beef brought, owing to the great depression of the market for the causes above stated. That the said Huth & Co. used every endeavor to sell the beef at the earliest moment and at the best price, and that they used the best management in its disposition, and acted with it just as if it had been their own.

On the part of the defendant it was proved, by William Hawkins, that said witness had been employed by the defendant for four years past, that his business was to cut and pack the beef put up in the defendant's establishment in the city of Baltimore; that he assisted in cutting and packing all the beef packed in said establishment in the winter of 1859 and 1860, that all the beef packed there during that season was good fat beef; that he worked under the direction of Simon Fenelly, since dead, but at that time foreman of Mr. Adams; that all the said beef was of good quality, and was packed in tierces and branded with the defendant's name. That the whole amount of beef packed by Adams in the winter of 1859 and 1860, was 2000 tierces. Adams often had other beef at his place than what was packed by himself; witness never saw any beef which was brought from other places to Adams' cellars, taken out of

the barrels in which it came and packed into tierces, it was put back into barrels and marked, "repacked by Adams;" and further proved by Valentine Deenery, a competent witness, that said witness had been working for defendant in his beef packing establishment in Baltimore for about fifteen years, that he selected, weighed and salted the beef; that from the fall of 1859 to the summer of 1860, Simon Fenelly, superintended the work of said establishment, and since then witness has superintended it, that witness selected and weighed all the beef packed at the defendant's establishment in the season of 1859 and 1860, and all said beef was of the first quality and properly cut, salted and packed; that said Fenelly was a very skilful man in his business, and very careful; and that the cellars in which the defendant kept his meat after it was packed, and before it was sold or shipped, were very large and cool. The beef packed in season 1859 and 1860, was as good as usual, he does not know what beef went by the barque Emilia, a good many tierces were packed this season. Beef came to Adams' cellar during the season, which was not cured by him, and was shipped by Adams, in barrels, but none of this kind in tierces; witness never knew of any of this beef thus bought by Adams being taken from the barrels in which it came and put into tierces.

And the defendant further proved by Patrick Hackett, that during the whole season of 1859 and 1860, said witness was employed as packer in the defendant's establishment, that he saw all the beef during that season cut and packed there, that all said beef was of the very best, the cattle were all good, and they were well cut, salted and packed. He thinks that about 2000 tierces were packed that season, no beef, already cured by others and purchased by the defendant, was repacked by defendant in tierces, but such beef was always put into barrels.

And he further proved by James C. Adams, Jr., a competent witness, that said witness had, for many years, been employed in the establishment of the defendant, who is

witness's father, that witness is now a partner of the said defendant, that he acted then as book-keeper, and also gave a general superintendence to all the operations then carried on, and that no lot of beef is there packed without his inspecting it; that he saw the beef which was shipped by the "Emilia," to F. Huth & Co. of London; that the greatest care was used in cutting, salting and packing it, and that the cattle of which said beef was made, was extraordinarily good, that all the cattle killed in said establishment, and there cut and packed during the season of 1859 and 1860, of which the beef sent per Emilia was part, were finer than usual; that the different grades of India beef, India mess beef and prime mess beef, were the best quality of the said grades, and all of such kinds packed during the said season were uniform in quality; that about two thousand tierces were cut and packed at said establishment during said season; that the persons engaged in cutting, salting, weighing and packing the said beef during that season, some of whom had testified in this case, were competent and skillful men in the discharge of their duties; that Simon Fenelly superintended the packing and was a superior man in his business.

The said witness further proved, that other parts of the same lot of beef cut and packed in the defendant's establishment in said season of 1859 and 1860, of exactly the same quality in its several grades as the 353 tierces sent per Emilia to F. Huth & Co. of London, were sent to London in the spring of 1860, and there sold by A. and T. Nesbitts, the consignees of the defendant, and the net proceeds received by the defendant.

Said witness further proved, that the effect of keeping salted beef over to the year following that in which it was packed, is greatly to depreciate its value, that it thereby loses in weight, the pickle leaks off, and it is very apt to become tainted, that no dealer in provisions, of ordinary prudence, would keep on hand beef packed in the winter of 1859 and 1860, from spring of 1860 to the summer and fall

of 1861, if it was possible to make sales; it would be the duty of a consignee in such a case to sell as early as possible, if the beef sent per Emilia arrived in London in February or March 1860, and during the spring and summer of 1860, the prices of beef were steadily declining with no prospect of improvement, a dealer of ordinary prudence having such beef in charge would hasten to realise; if the beef was not in good condition when it arrived, the duty to sell as early as possible would be still more imperative, as beef of bad quality deteriorates more rapidly than what is good.

On cross-examination the said witness proved that the defendant in the summer of 1860, shipped through Hall & Loney of Baltimore, to London and other places, a lot of prime mess beef, not cut, cured or packed by said defendant, but purchased by him in that summer and repacked in tierces, it was inferior to that shipped per Emilia, and the invoice price of it was but $16 per tierce; and it was not marked with the brand of the defendant, but with the name of A. Libby and V. Deering; that no beef was marked with the name of the defendant, except that actually cured by him; that Messrs. Hall & Loney were informed of the quality of the beef shipped through them, and were told that Mr. Adams, the defendant, would not permit his name to be branded upon the tierces containing it; that this beef sent through Messrs. Hall & Loney, sold for less than the invoice price.

The defendant further proved by Edward Williams, a competent witness, that he has been for thirty years a dealer in cattle, and that for many years he has purchased all the cattle used by Mr. Adams, the defendant, in his establishment, that his instructions from Mr. Adams were always to buy for him the best cattle, and he did so; that all the cattle purchased for defendant in the season of 1859 and 1860, were of good quality, and witness saw them when cut up.

And he further proved by George Cassard, a competent

Adams *vs.* Capron, et al.

witness, that said witness has been a packer of pork and beef for twenty-five years past; that beef kept over one season is much deteriorated, becomes hard and loses its valuable juices, that it suffers much more from this cause than pork or any other meat. The deterioration in beef in this way is from 20 to 40 per cent. Beef that is tainted is worth from one-half to one-third its original value. Beef not only actually deteriorates if kept over to another season, but it thereby loses more in price than its actual deterioration, as it is used almost entirely in England for army stores, and is not easily disposed of if kept over the year. If beef of the season of 1859 and 1860, was in the spring of 1860, in a consignee's hand in London, and the prices were steadily declining during the summer and fall of 1860, and there was no prospect of any improvement, it would clearly be the course of a man of ordinary prudence having such beef on hand, to sell at as early a day as possible; and if the beef were in bad condition when it arrived in London, it would be still more necessary to sell as soon as possible.

And the said witness on cross-examination said, that there might be circumstances under which it would not be proper to make sales, as when the sacrifice would be too great, and of course, if it were impossible to effect sales, there would be no fault in the consignee in keeping over the provisions consigned to him.

The plaintiff then proved by the said Taylor Hall, that in the latter part of June 1860, the defendant shipped through him to London 150 tierces of prime mess beef, which was invoiced at $16 a tierce, on which an advance was made of $14 a tierce, and which was not of the defendant's own curing, but had been purchased by the defendant, and repacked at his establishment. The defendant represented it to be of inferior quality, he never told witness that it was not worthy of his (Adams') brand, and that he would not put his brand on it, witness now believes it was western beef, and never would have taken it if he

had known this; Adams did not show witness the brand he put on it, witness never saw it.

The plaintiffs' counsel then asked the witness what the said consignment of beef sold for in London, and when it was sold? to which question the defendant, by his counsel, objected, and objected to the said witness answering the same; but the Court (Brewer, J.) overruled said objection, and permitted said witness to answer said question, and to give in evidence to the jury what was the amount of pro-ceeds of sale of said 150 tierces of beef in London. This rnling of the Court forms the ground of the defendant's first exception.

*Second Exception.* After the evidence set forth at length in the defendant's first bill of exceptions, the plaintiff proved by the said Taylor Hall, that the proceeds of sales of the said 150 tierces of beef sent to London in June 1860, and which said beef was sold in 1860 and 1861, netted but two two dollars a tierce.

On cross-examination said witness said, the name of the defendant, Mr. Adams, was not on the said tierces. It could not be sold on account of its condition; Mr. Adams was too shrewd a man to permit his name to go upon an inferior article, as doing so would injure his reputation as a beef packer. The provision brokers in London make up weekly price currents, and furnish them to the merchants there.

The plaintiff then proved by Francis Dolphin, a compe-tent witness, that he worked in the defendant's establish-ment in part of the season of 1859 and 1860, and helped to cut the beef, that some small pieces were put into the tierces, and sometimes the defendant would send out and get some pieces to make up a lot. He does not think that S. Fenelly understood his business, he cut the pieces too small. Defendant during this season had to get beef cured by other persons to fill up some of the tierces containing beef cured by himself.

The plaintiffs by their counsel then prayed the Court to. instruct the jury, as follows:

Adams *vs.* Capron, et al.

*Plaintiffs' Prayer.* If the jury·shall find from the evidence in this cause, that the plaintiffs made the advances mentioned in the receipt of the 22nd February 1860, and on the terms therein stated, and that said advances were the proceeds of bills of exchange drawn by the plaintiffs on Huth & Co., under the terms. of the agreement embraced in the letter of Huth & Co. to the plaintiffs, dated September 3rd, 1858, and that the said 353 tierces were to the knowledge of the defendant consigned to Huth & Co., in the manner stated in the evidence, and by them sold as stated in their account of sales read in evidence. And if the jury further find that the said account of sales was handed to the defendant on the 25th November 1861, and within a reasonable time after its receipt by the plaintiffs, then the plaintiffs are entitled to recover the difference between the amount of the advances aforesaid, and the net proceeds of said sales as shown by said account of sales, and in fixing the amount of such recovery, the jury may on the whole evidence award such a sum of money as will fully reimburse to the plaintiffs the full amount of their said advances without loss or diminution.

And the defendant by his counsel prayed the Court to instruct the jury as follows:

*Defendant's 1st Prayer.* If the jury shall find from the evidence in this case, that in the months of February and March 1860, the plaintiffs were merchants in the city of Baltimore, and correspondents of the house of F. Huth & Co., of London, and that in regard to consignments of provisions from the port of Baltimore to the said house of F. Huth & Co. in London, the plaintiffs acted at that time ·under the terms of agreement stated in the letter of said F. Huth & Co. to the plaintiffs, dated "London, 3rd September 1858," a copy of which is returned as part of the evidence taken under the commission issued in this case to London, and that in said month of February 1860, the plaintiffs induced the defendant to ship to said F. Huth & Co., by the barque Emilia, 353 tierces of beef mentioned

in the bill of lading in the letter of the defendant to F. Huth & Co., dated February 25th, 1860, and in the invoice contained in said letter, all offered in evidence under said commission by the plaintiffs; and that at the time of making said shipment or previously thereto, it was arranged between the plaintiffs, acting under the terms of agreement stated in said letter of F. Huth & Co., of 3rd September 1858, and the defendant, that an advance should be made to the defendant, on said shipment of 353 tierces of beef of the proceeds of drafts on F. Huth & Co., for certain agreed amounts, and that such proceeds of said drafts and nothing more, were paid by the plaintiffs to the defendant; and that the plaintiffs have never paid any part of said advances to the said F. Huth & Co.; and if the jury shall further find that the said F. Huth & Co., in March 1860, received and took charge of the said 353 tierces of beef consigned to them by the said bill of lading, and that in consequence of the misconduct or negligence of the said F. Huth & Co., or of brokers employed by them to sell said beef, the net amount realised from the sales of said beef, after satisfying commissions and all other proper charges, was less than the amount of the advances made to the defendant on said beef and interest thereon, and that had it not been for such misconduct or negligence, the said beef might have been sold at prices which would have fully covered said advances and interest, and all commissions and proper charges, then the plaintiffs are not entitled to recover in this case; and the said F. Huth & Co. and the said brokers so employed by them, were bound to exercise in regard to sales of said beef, the skill, care and industry of men of ordinary prudence engaged in their respective lines of business.

*Defendant's 2nd Prayer.* If the jury shall find from the evidence the facts in the defendant's first prayer, and shall further find in this case that on the 1st of January 1861, the greater portion of said beef remained on hand unsold, and so remained until October 1861, and that the condi-

tion and quality of the said beef so remaining on hand was such that it was impossible to make sales thereof in the London market, except at less than two-thirds of the invoice price, and that this fact was known to said F. Huth & Co., then the plaintiffs are not entitled to recover in this case, unless the jury shall find from the evidence that reasonable notice of said fact was given to the defendant before further sales were made.

The Court below, (BREWER, J.,) granted the prayer of the plaintiffs, and the first prayer of the defendant, but refused to grant the second prayer of the defendant, to which action of the Court forms the ground of the 2nd exception.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH and COCHRAN, J.

*Thos. Donaldson,* for the appellant:

It is insisted on the first exception, that the testimony objected to was irrelevant, not pertinent to the issue joined, and calculated to mislead the jury. *Holcomb vs. Hewson,* 2 *Camb.,* 391. *Boldron vs. Widdows,* 1 *C. & P.,* 68. *Standish vs. Washburn,* 21 *Pick.,* 237. *Perry vs. Smith,* 22 *Vermt.,* 30, (7 *Washburn,*) 301. *Foy vs. Leighton,* 2 *Foster,* 71. *Davis vs. Charles River Branch R. R. Co.,* 11 *Cush.,* 506. *Barden vs. De Keverberg,* 2 *M. & W.,* 61. *Walkup vs. Pratt,* 5 *H. & J.,* 51. *Goodhand vs. Benton,* 6 *G. & J.,* 485. *B. & Susq. R. R. Co. vs. Woodruff,* 4 *Md. Rep.,* 253. *Mitchell vs. Sellman,* 5 *Md. Rep.,* 385. *Warner vs. Hardy,* 6 *Md. Rep.,* 525. *Story on Agency,* 348. *Frothingham vs. Everton,* 12 *N. H.,* 239. *Dodge vs. Wilbur,* 6 *Selden,* 579. *Burrill vs. Phillips,* 1 *Gall.,* 360. *Dodge vs. Tileston,* 12 *Pick.,* 328.

The plaintiff's prayer was improperly granted, because:

1. The plaintiff had, under the evidence in the case, no right of action against the defendant; Huth & Co., and they alone, made the advances, and the contract was be-

tween them and Adams, although the receipt was given to Capron & Co., who were agents of the London house. *Treat vs. Stanton,* 14 *Conn.,* 451. *Huntington vs. Knox,* 7 *Cush.,* 371. *Dodge vs. Wilbur,* 6 *Seld.,* 579.

2. The prayer is uncertain in its terms, and calculated to mislead the jury. One of the facts to be found by the jury, according to the prayer, is—" that the 355 tierces were, to the knowledge of the defendant, consigned to Huth & Co., *in the manner stated in the evidence."* Now the evidence shows two invoices—one sent by Adams, and one by Capron & Co.—and there is other evidence on both sides, some to the effect that Adams was the consignor, and some that Capron & Co. were the consignors.

The last clause of the said prayer, authorizing the jury " to award such sum of money as will *fully reimburse to the plaintiffs the full amount of their said advances without loss or diminution,"* was either inconsistent with the immediately preceding portion of the instructions, and essentially wrong in principle; or if not so inconsistent, was superfluous, and calculated, by its ambiguous terms, to mislead the jury.

The appellant also insists that the defendant's second prayer was improperly rejected, and that it was the duty of Huth & Co. to have given notice to the defendant that the beef could only be sold at such a ruinous depreciation, so that he might have re-paid the advances, and ordered a re-shipment to this country. *Marfield vs. Goodhue,* 3 *Comst.,* 62. *Story on Agency, sec.* 208.

*Bernard Carter,* for the appellees, contended, that in the absence of all *pretence even* of any fraud or improper conduct of any kind whatsoever on the part of Capron & Co., the only legitimate inquiries at the trial of this cause were whether an account sales of the 353 tierces of beef were kept.

Admitting that Huth & Co. did not exercise reasonable skill and diligence in making sales of said beef, and that

the deficiency which is the subject of this suit, arose from the want of the exercise of such skill and diligence on their part, yet under the evidence in this cause, *this would afford no defence to this action.* When Adams agreed in writing on the 22d February 1860, to refund Capron & Co. any deficiency in the amount advanced, which should exist after the beef shipped on the barque Emilia had been sold, this very beef had been by *him* ladened on this vessel, consigned by the very terms of the bill of lading in his own handwriting to Huth & Co., to whom he wrote telling them *he had consigned* the beef to them, and directing them what to do; he agreed then by his very words to pay Capron & Co. any deficiency which might arise from the sales to be made by Huth & Co. See *Story on Agency*, secs. 33, 131.

Nor were Huth & Co. in any sense the agents of Capron & Co., so far as the sale of the beef was concerned; nor indeed in any sense their agents. The only relation existing between Huth & Co. and Capron & Co., was that created by the letter of September 3d, 1858, and that was only an agreement of Huth & Co. to honor the drafts of Capron & Co. to a certain extent; the effect of this arrangement was only to place funds to a certain amount in London to the credit of Capron & Co.; and the case is the same as if they had shipped gold or sent bankers' bills to London on which to draw.

It was in accordance with this theory that the instruction asked for by the appellees in the Court below was framed.

The appellees' prayer predicates their right to recover on the finding by the jury of these facts:

1. That the appellees made the advances mentioned in the receipt of 22d February 1860, and on the terms therein stated.

2. That the 353 tierces of beef were, to the knowledge of the appellant, consigned to Huth & Co. in the manner stated in the evidence, and were sold by them as stated in their accounts of sales offered in evidence.

3. That these accounts of sales were duly presented to the appellant within reasonable time after their receipt, and that the net amount of said sales, so shown, was less than the advances made.

If these facts should be found by the jury, the prayer declares the right of the appellees to recover the difference between the amount of the advances and the net proceeds of said sales as shown by said accounts of sales.

The written agreement of February 22nd, 1850, is sufficient to enable Capron & Co. to maintain this action, even if they had been acting as agents in the transaction for Huth & Co. *Sto. on Agency*, secs. 393, 398 and 399 *et seq.*

In regard to that part of the prayer of the appellees, which has reference to the *measure* of the recovery of the appellees, the instruction as given only carries out the contract of the appellant, which was to pay back to Capron & Co. such part of the money advanced as they should fail to receive from the sales of the beef.

The 1st prayer of the appellant was *granted*, we think erroneously granted; but the appellant by it had the full benefit before the jury of his own theory of the case, and, by the finding of the jury under that instruction, it has been determined that the whole ground of the defence taken by the appellant, had nothing whereon to stand in the evidence offered to sustain it.

The appellant's 2nd prayer was properly rejected; first, for the reasons apparent from the preceding part of our argument. But this prayer would be erroneous even if Huth & Co. were the plaintiffs in this action, and that for several reasons: 1st. It arbitrarily assumes the 1st of January 1861, and 1st of October 1861, as the times after which, and two-thirds of the invoice price as the price below which, no sale should have been made by Huth & Co., without giving Adams notice that they would sell; and this assumption is made too in the face of Adams' three letters of February 23rd, April 2nd and July 19th, 1860, and which are the

*only* letters ever written by him to Huth & Co., by which he gave the fullest discretion to Huth & Co. as to sales, telling them to *"do with it just as if it was their own."* 2d. Even if all these letters were out of the record, yet the proposition of law announced in the prayer is directly the contrary of that announced by the Supreme Court of the United States. See *Brown vs. McGran*, 14 *Peters*, 479, 489.

The only question on the 1st exception is, whether there is anything in the action of the Circuit Court in admitting certain evidence offered by the appellees, for which the judgment in this case should be reversed. We say there is not.

1st. As we have hereinbefore argued, the right of the appellees to recover in this action is not affected by the answer to be given to the question whether Huth & Co. acted with due diligence, skill, &c., in making the sales of the beef on which the advances were made. If we are right in this point, then although this Court should be of opinion that the evidence in question would be improper in a case where the question of diligence, &c., on the part of Huth & Co. *vel non*, was in issue, yet inasmuch as in this case no such inquiry can be gone into, the admission of the evidence in question is no ground for a reversal, because it was only intended to answer evidence which we were not bound to answer, and which was directed to an inquiry immaterial to and having no bearing on the decision of the case, and its admission therefore did no harm to the appellant. *Blackwell vs. Patton,* 7 *Cranch,* 478. *Greenleaf vs. Birth,* 5 *Peters,* 135. *Mulliken vs. Boyce,* 1 *Gill,* 65.

2nd. But there can be no doubt that this evidence was properly admitted in any view which can be taken of the case. It was admissible as rebutting evidence. *Pegg vs. Warford,* 7 *Md. Rep.,* 608. *Milburn vs. State,* 1 *Md. Rep.,* 14. *Townshend vs. Townshend,* 6 *Md. Rep.,* 295.

The objection to the evidence admitted, if it had any force, came too late, as the effect would be to shut out a

part of the *res gesta*, suffered to go before the jury with the acquiescence of the defendant.   *Marfield vs. Davidson*, 8 *G. & J.*, 209.   *Shanks vs. Dent*, 8 *Gill*, 120.   *Dent vs. Hancock*, 5 *Gill*, 127.

COCHRAN, J., delivered the opinion of this Court:

This suit was brought to recover advances upon an invoice of beef consigned by the appellant to Messrs. Huth & Co., of London.   The advances were made to an amount largely exceeding the proceeds of the invoice, by drafts on Huth & Co., who had authorized the appellees to draw for the advances, upon their undertaking to be responsible for the amount of their overdrafts.   When these advances were made, the appellees, to protect themselves from loss, obtained from the appellant his promise to refund the amount advanced above the proceeds of his consignment. The relation of Huth & Co. to the appellant, thus appears to have been that of an agent or factor, and towards the appellees that of a principal, entitled upon their contract to repayment of the amount overdrawn.   The principles applicable to these relations must therefore be regarded in disposing of the questions presented by these exceptions. Assuming that Huth & Co. performed their duties as consignees or agents with due care and skill, we may remark generally that they have the right to be reimbursed to the full amount of their advances, and that they may assert that right against the appellant as their principal, giving him credit for the proceeds of his consignment, or against the appellees upon their undertaking of that liability; and the appellant may be required to refund to either of these parties, although he can be compelled to make but one satisfaction.   If, however, there was negligence or misconduct on the part of Huth & Co., by which he sustained loss or damage, their right, as well as that of the appellees, to recover the excess of advances above the proceeds of the consignment, at most is only a qualified one, for the appellant may rely upon such negligence or misconduct as a defence

to any claim that either of them could make on that ground. The appellees, by a clear implication from their prayer, predicate their claim upon their liability to Huth & Co., and there can be no error in assuming that liability as the true measure or standard of their rights in this case. They became liable to an action on their contract to Huth & Co. upon their rendition of the account of sales showing the amount overdrawn, and in·our opinion, a right of action then accrued to the appellees upon the appellant's promise to them, subject, nevertheless, to such defences as he could make on the ground of negligence or misconduct on the part of Huth & Co. These principles are familiar, and, indeed, the theory of the case on both sides seems to require their concession. In applying them to the case as it stands upon the evidence contained in the 2d exception, we find error in the prayer of the appellees, granted by the Court below. Upon the hypothesis of that prayer, the jury were authorized to find a verdict in their favor, without regard to the conduct of Huth & Co., in reference to which evidence was offered on both sides. The fact of due care and diligence on the part of Huth & Co. was thus clearly shown to be an essential element of the appellee's case, and it cannot be doubted that the instruction as to their right of recovery was founded on a hypothesis of fact which took from the jury the finding of other facts by which the right to recover might have been impaired or defeated. It is no answer to this proposition to say that an instruction may be had upon any given statement of fact, for even upon the authority of *Whiteford vs. Burkmyer & Adams*, 1 *Gill*, 127, that can be done only when the instruction asked is subordinate to, or in aid of a theory which embraces all the facts material to establish or defeat the right in controversy. The effect of an instruction that a plaintiff is entitled to recover upon the finding of certain particular facts, is to withdraw from the jury the finding of any other fact that would gratify or defeat the right asserted. *Riggin vs. Patapsco Ins. Co.,* 7 *H. & J.,* 291. And in the case of *Bosley vs. Chesapeake Ins.*

*Co.,* 3 *G. & J.,* 462, a prayer, predicated upon a statement of facts that did not enumerate all the other facts material to the right of recovery, of which evidence was offered, was held to be defective. This principle is fully sustained by the more recent case of *McTavish vs. Carroll,* 7 *Md.,* 366, in which the Court said, "that when the proof of the defendant, if believed by the jury, would establish any proposition inconsistent with the theory of the plaintiff's prayer, which is based upon his own evidence, such prayer cannot be given, because it must assume or admit all the defendant's proof on the subject." The appellant's first prayer, which was granted, although presenting an immaterial question of fact as to the non-payment to Huth & Co., by the appellees, of the overdrafts, nevertheless submits the appropriate instruction upon the evidence in the case. The right of the appellees is fairly presented as dependent upon the fact of due care and diligence on the part of Huth & Co., and in that view the prayer seems to be unobjectionable. In this particular, the prayer of the appellees is entirely inconsistent with that of the appellant, and we think it should have been rejected on that ground, if upon no other. The rendition of a verdict in conformity with either of them, necessarily implies a disregard of principles prescribed by the other, and it is impossible for us to say to which of these instructions the verdict should be referred. The answer, that the proper instruction was given in the appellant's prayer, does not meet the case, for it does not appear to have been submitted in such terms as would impose any limitation upon the inconsistent and opposing theory of that offered by the appellees. It was given neither in lieu of, nor as a qualification of the appellees prayer, and in the case of *Haney vs. Marshall,* 9 *Md.,* 215, the Court held, that an erroneous prayer like that of the appellees, standing in the same relation to a proper instruction granted on the other side, should have been rejected, and we must hold here, as was held there, that we cannot refuse to reverse, on the ground of no injury done, because this record does not show the absence of such injury.

Adams vs. Capron, et al.

The appellant's second prayer was properly refused. He appears to have made the consignment without any restrictions, and also to have authorized his consignees to deal with it as their own. Under these circumstances, it is difficult to perceive upon what ground he was entitled to notice from them of its depreciated value before selling it. The proposition of the prayer appears to be founded upon no defined or established rule of law applicable to that relationship of the parties.

The first exception taken to the admission of evidence, we think cannot be sustained. Evidence in regard to certain sales made in London, of beef cured and packed by the appellant, had been previously offered without objection, for the purpose of showing or raising a presumption of negligence on the part of Hutl & Co., and the evidence in question was offered to show the sale of other beef shipped by the appellant to the same market, for the purpose of rebutting or destroying the effect of that before offered. The objection was taken on the ground that the rebutting evidence did not relate to the same subject-matter, and for that reason was not admissible. We find by examining the testimony of Hawkins, Hackett and Adams, that there was a conflict of evidence on that point, and that the Court could not have sustained the objection taken without assuming, that the beef spoken of in the evidence objected to was not cured by the appellant. That we think the Court was not at liberty to do, and although the objection might have been successfully presented by an instruction to the jury that this evidence was not to be considered, if they should find that the beef mentioned was not cured by the appellant, still, we think, as it comes before us in this exception, that the ruling was proper.

Finding that the Court erred in granting the appellees prayer, we shall reverse the judgment.

*Judgment reversed, and procedendo awarded.*

(Decided March 2d, 1864.)