VERMONT MARBLE COMPANY *v.* CARLOS E. MEAD AND GEORGE P. EASTMAN.

Special Term at Rutland, 1910.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed July 31, 1911.

*Principal and Agent—Agent's Authority to Sell Land—Extent— Presumptions—Agent's Good Faith—Exercise of Authority— Abuse— Agent's Discretion—Evidence—Vendor and Purchaser— Offer and Acceptance—Limits of Offer—Place of Acceptance—Specific Performance—Persons Against Whom Enforceable—Purchasers—Waiver of Rights—Bona Fides— Notice— Facts Putting on Inquiry—Conditions Precedent— Parties.*

Express authority to an agent to do a designated thing gives him implied authority to do all that is necessary to accomplish the object for which the express authority is given.

In a suit for specific performance of an agreement for the sale of land, made by one tenant in common thereof for himself and his co-tenant, evidence *held* to show that the former had the latter's authority to sign a written contract for the sale of his interest in the land.

Where the three tenants in common of certain land were two brothers and a sister, and one brother and the sister lived near the land, while the other brother lived at a long distance and in another state, and authorized the execution for himself by his said brother of a contract for the sale of the land, and all parties desired the land to be sold for the common interest, the brother who made the sale was not a mere broker

for the other brother, within rule, if it exists, that the mere employment of an ordinary real estate broker to sell land for a designated price and terms does not give him authority to make a binding contract of sale.

The law requires the utmost good faith by agents towards their principals.

An agent with limited authority can bind his principal only by an act authorized by the express authority given, or by necessary implication therefrom; and the person with whom he deals is chargeable with knowledge of the agent's limited authority.

In a suit for specific performance of a contract for the sale of land owned by defendant and his brother and sister as tenants in common, evidence *held* to show that the brother was not guilty of misconduct in executing the contract as defendant's agent.

It will be presumed, in the absence of evidence to the contrary, that an agent's acts within the scope of his authority were done in good faith.

An offer to purchase land may properly be limited as to time and place of acceptance, and can result in a binding contract only when accepted according to the terms therein specified.

The exercise by an agent of a discretionary power delegated to him by the principal binds the principal.

Where two of three tenants in common of land, for themselves, and one of them as agent for the other co-tenant, executed a contract with orator for the sale of the land to him, and part payment was made on the whole purchase price, the application of that payment to the price of the undivided interest subsequently conveyed by those two co-tenants in accordance with the terms of the contract did not constitute a waiver of orator's right to enforce specific performance of the contract by a purchaser of the other co-tenant's interest.

About the time that two of three tenants in common of land, for themselves, and one of them as agent for the absent co-tenant, executed a contract with orator for a sale of the land to him, defendant came into the room and learned in a general way that the whole property was contracted to orator, but not what authority the one co-tenant had to sign the absent co-tenant's name, and made no inquiry as to the nature and extent of that authority, though he knew the right so to sign the contract was claimed, but subsequently took from the absent co-tenant a deed of his interest in the land. *Held*, that defendant was put upon inquiry as to the authority the one co-tenant had to sign the absent co-tenant's name, and failing to inquire, was charged with orator's equitable title under the contract, and being so chargeable was as much a trustee as his vendor, and will be required to convey to the orator.

In law a contract for the sale of land gives the grantee no interest therein, but is executory in every respect. The vendor remains the owner of the property, and can convey it free from any legal claim under the contract.

In equity, if the grantee of land is a *bona fide* purchaser without notice of the equitable title of one holding prior contract to purchase, the legal

ownership will cut off the equitable estate so as to prevent specific performance of the agreement to convey.

In equity, if a second purchaser of land has notice of the equitable title of one having a prior contract to purchase, the latter may follow the property into the hands of the second purchaser, or require him to account for the purchase money, thereby affirming the sale; but he has not the absolute equitable right to do that until he pays the purchase money specified in his contract.

In a suit for specific performance brought by one holding a contract to purchase land against the grantee of the orator's vendor, the latter is not a necessary party.

APPEAL IN CHANCERY. Heard on pleadings and master's report at the September Term, 1910, Rutland County, *Hall,* Chancellor. Case discontinued as to Carlos E. Mead on account of his death; and decree against George P. Eastman in accordance with the amended prayer of the bill. Said Eastman appealed. The opinion states the case.

*Frank C. Partridge* and *T. W. Moloney* for the orator.

The language of Carlos E. Mead's letter gives authority to sell and convey. *Stadleman* v. *Fitzgerald,* 14 Nebr. 290; 29 Am. & Eng. Enc., 2nd Ed. 848; *Ide* v. *Stanton,* 15 Vt. 685; *Lyon.* v. *Pollock,* 99 U. S. 668; 1 Am. & Eng. Enc., 2nd Ed. 999; *Craighead* v. *Peterson,* 72 N. Y. 284; 31 Cyc. 1407; *Haydock* v. *Stow,* 40 N. Y. 363; *Sweelzer* v. *Met. Life Ins. Co.,* 8 Misc. Rep. (N. Y.) 250; *Cander* v. *Carey,* 14 Misc. Rep. (N. Y.) 324. This case must be distinguished from that of a real estate broker or agent, although there is authority that such a broker may bind his principal by a contract to sell. *Pringle* v. *Spaulding,* 53 Barb. 17; *Johnson* v. *Dodge,* 17 Ill. 433; *Weaver* v. *Snively,* 73 Nebr. 35; *Smith* v. *Allen,* 86 Mo. 178.

The defendant Eastman is chargeable with notice of the rights of the orator in the premises in question. 21 Am. & Eng. Enc., 2nd Ed. 584; 23 Cyc. 1114; *Booth* v. *Barnum,* 9 Conn. 989, 23 Am. Dec. 339; *Williamson* v. *Brown,* 15 N. Y. 354; *Gree* v. *Slayter,* 4 Johns. Ch. Rep. 38; *Baker* v. *Bliss,* 39 N. Y. 70; *Pringle* v. *Philips,* 5 Sandf. 157; *Stafford* v. *Ballou,* 17 Vt. 329; *Limerick Bank* v. *Adams,* 70 Vt. 132; *Gould* v. *Stevens,* 43 Vt. 125; *Roth* v. *Colvin,* 32 Vt. 135; 23 Am. & Eng. Enc., 2nd Ed.

515; *Littleton* v. *Giddings*, 47 Tex. 109; *Skeel* v. *Spraker*, 8 Paige 196; *Loring* v. *Brodie*, 134 Mass. 453.

*F. D. White* and *Charles L. Howe* for the defendant.

· The language of the letter of Carlos E. Mead does not confer authority to make a binding contract of sale. The law is well settled that authority "to sell" does not mean authority to sign a contract for the sale. *Morris* v. *Ruddy*, 20 N. J. Eq. 236; *Lindley* v. *Keim*, 54 N. J. Eq. 418; *McCullogh* v. *Hitchcock*, 71 Conn. 401; 23 Am. & Eng. Enc. 901, note 10, and cases cited; *Duffy* v. *Hobson*, 40 Cal. 240, 6 Am. Rep. 617; *Hall* v. *Gambrill*, 88 Fed. 709; *Larson* v. *O'Hara*, 98 Minn. 71, 116 Am. State Rep. 342; *Weatherhead* v. *Ettinger*, 78 Ohio St. 104, 17 L. R. A. (N. S.) 210, and cases cited in note. And the agent here in question was one with limited powers and orator was bound by the actual extent of those powers. *Baring* v. *Pierce*, 40 Am. Dec. 534; *White* v. *Langdon*, 30 Vt. 599; *Sprague* v. *Train*, 34 Vt. 150; *Cleveland* v. *Pearl & Co.*, 63 Vt. 127; *Merritt* v. *Wassenich*, 49 Fed. 785-789; Clark & Skyles on Agency, §194, page 459. An order to an agent to get competing firms to bid against each other is a limitation on the agent's authority of the nature of an instruction not to sell below a certain price. *Bush* v. *Cole*, 28 N. Y. 261; *Hennessey* v. *Woolworth*, 128 U. S. 438, 32 Law. ed. 500; *De Sollar* v. *Hanscome*, 158 U. S. 216, 39 Law. ed. 956; *Riley* v. *Wheeler*, 44 Vt. 189. And the orator knew that John H. Mead had not fulfilled this direction to get competing bids, and so was guilty of misconduct toward his brother, and by that knowledge orator is barred to force a conveyance to him. *Barnard* v. *Wheeler*, 24 Me. 412; *Bryant* v. *Moore*, 26 Me. 84; *Holden* v. *Durant*, 29 Vt. 284; *Catoir* v. *Am. Life etc. Co.*, 33 N. J. L. 487; *City of Findlay* v. *Pertz*, 66 Fed. 427; *Mod. Woodman of Am.* v. *Tevis*, 117 Fed. 369.

WATSON, J.   The bill is for specific performance of a contract for the sale to the orator of a certain piece of quarry land and an undivided one-tenth of another piece of quarry land adjoining, both located in the town of West Rutland, this State. Before and at the time of making the contract in question the

property covered by it was owned equally by Carlos E. Mead, a resident of Chicago, Illinois, and his brother John H. Mead, and their sister, Charity R. Burr, as tenants in common. John and Charity resided in West Rutland, near to each other and to the common property. The contract was dated June 1, 1905, and was for the sale of their united interests. It was signed by John and Charity for themselves, by Carlos through John as agent, and by the orator. Carlos refused to sign a deed of conveyance to the orator in performance of the contract. After said contract was entered into, he sold and conveyed his undivided interest in all said property to the defendant George P. Eastman. No question is made but that the contract is sufficient in substance to answer the requirements of the Statute of Frauds. It is contended, however, that Carlos never gave John power to make and sign a binding contract for the sale of his interest in the property, and therefore he was not bound by this contract.

Our Statute of Frauds provides that no action at law or in equity shall be brought upon a contract for the sale of real estate or an interest therein, unless the contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized in writing. P. S. 1576.

The master finds that Carlos, John, and Charity were all desirous of selling their common interests in both these pieces of land, and to that end, John and Charity entered into negotiations with the orator; that after some preliminaries and on June 1, 1905, the contract in question was concluded to sell to the orator the entire interests of the three co-tenants in said premises, for the sum of sixty-three hundred dollars, two hundred dollars of which was then paid in cash, and the balance of sixty-one hundred dollars was to be paid after the orator had examined the title and when the deed was passed; that previous to June 1, considerable correspondence passed between John and his sister on the one part and Carlos on the other, with reference to the sale of these lands, but that all the authority which John had for signing this contract for his brother, was given in letters from the latter of May 25, and of May 29, 1905.

To determine the scope of the authority thus conferred we must, as far as possible on the facts and circumstances shown by the record, put ourselves in the place of the writer, reading the letters as it were with his eyes.

It appears that sometime before the 25th of May, 1905, John and Charity were offered six thousand dollars for the property by the orator, and that Charity wrote Carlos a letter concerning it, in reply to which Carlos sent them the letter of May 25, saying:

"I should say accept at once. We might do better if we worked the Columbian and Vermont Marble Co. against each other, asking each to give best bid at once. But we might lose. Father used to say it is a good time to sell when we get a good price. I know there is over $6000.00 worth of marble in that one-tenth, but we cannot get it out. So it is my judgment to sell it." On receipt of this letter John wrote Carlos as follows: "Your reply to Chick's (Charity's) letter just received. But you do not make it plain in your letter what we want to know. The Vermont Marble Company has offered us $6000.00 for the one-tenth interest in the Fant Marble property and the Manley quarry inclusive, and I am working hard to get the bid raised by Eastman who is opening the quarry you were interested in. We have not had a chance to realize anything on it before, and now have a spot cash offer, and I feel that now is the time to sell because the marble business is on a boom and as it's higher and it's time to sell when we have a chance. *  *  *  * And I think Chick would like to sell as well as myself, and I want your permission to sell to the highest bidder for spot cash, by return mail, and I will get all I can."

As a part of the same letter Charity wrote: "We thought by your letter that you did not understand that the 'blue quarrry' or 'Manley quarry' was included with the one-tenth in the $6000.00 offer from the Vermont Marble Co. Now George Eastman has offered $100.00 more than the Vermont Marble Co. Johnny thinks perhaps he can bring it up to $10,000 as there is a little competition. Shall we let it go to the highest bidder? I think George Eastman is anxious to get it because he is afraid the Vt. Co. will work it with their other property each side of it and hurt him."

In reply Carlos wrote the letter of May 29, to John, which reads: "1905-5-29.

"Brother John:—Just got home and found that your letter got to the house an hour too late to catch me. I understood perfectly that the one-tenth interest in the Fant and the ten rods north of it, were included in the .deal. You have my idea. exactly in working two or .more firms in bidding against each other, so as to get the highest price possible.

"Also you have my sanction to sell as soon as you are satisfied you have the top notch in price, for $6000.00 or as much higher as you can work them up.

"Would it not be a good plan to see if you can get the Columbian Marble Co. started in to bid as well as the other two? I think if you can get it up to $10,000.00 you will do well. Keep cool and tell them to put in their best bid first as that is the one that will get it. If you do not sell it for spot cash, sell it for at least $6000.00 down and mortgage notes secured on the marble property for the balance. Keep cool and you may run it higher than the $10,000.00. But as soon as you are satisfied you have the top, close the deal.

"Your brother,

C. E. MEAD,

87 Artesian Ave., Chicago, Ill."

It is very apparent that these brothers and the sister were working in harmony for the benefit of their united interests. They were all anxious to sell and, as appears from these letters, thought the conditions of the marble business were sufficiently favorable to make the time most opportune for realizing a good price for the property. It appears in like manner that they all thought it best to accept the offer of $6000, unless a better one should be made. In his letter of May 25, where only that sum was particularly spoken of, Carlos wrote : "I should say accept at once."

Again in his letter of May 29, he says, "you have my sanction to sell as soon as you are satisfied you have the top notch price, for $6000,00 or as much higher as you can work them up. * * But as soon as you are satisfied you have the top close the deal." In neither of these letters does Carlos convey the idea that any offer made must be submitted to him before acceptance. To

the contrary, he is quite emphatic in directing his brother, when satisfied that he has been offered the "top notch price," to close the trade. But how was John to close it, unless given the power to make a contract or agreement in writing for that purpose, signed in a way to make it obligatory upon all of the common owners, as well as upon the purchaser? If the power to sell and "close the deal" does not carry with it the power to enter into a binding contract for the sale, answering the requirements of the Statute of Frauds, the power granted is ineffectual to accomplish the end for which it was intended. It is a rule of law that where an express authority is given to do a certain thing, such authority carries with it by implication authority to do all acts which may be necessary for the purpose of effecting the object for which the express authority is given. *Pole* v. *Leask*, 28 Beav. 562; *Vanada* v. *Hopkins*, 1 J. J. Marshall, 285, 19 Am. Dec. 92. We therefore hold that by said two letters John was lawfully authorized to make and sign a contract in writing for the sale of the interest of Carlos in all said property, and if the contract in question was concluded in · the proper performance of the duties of the agency it was binding upon the principal. The case of *Lyon* v. *Pollock*, 99 U. S. 668, 25 L.ed. 265, is much in point. And in *Haydock* v. *Stow*, 40 N. Y. 363, it is said that an agent authorized to sell either real or personal estate may enter into a contract, within the terms of his authority, which will bind his principal; and that this is the very essence of the authority to sell.

The defendant relies upon the rule, seemingly pretty generally laid down, that the mere employment of an ordinary real estate broker to effect a sale of land, even though the price and terms be prescribed, does not amount to giving present authority to such broker to conclude a binding contract for the same; and that the words "for sale" or "to sell" and the like, usually mean no more than to negotiate a sale by finding a purchaser upon satisfactory terms. Yet the facts of record show the agent not to have been a mere broker. Consequently even though the above rule be sound (a question not considered), it is not applicable here, where the principal and the agent, brothers, together with their sister, were equally interested as co-tenants in the property to be sold, the principal residing in a distant

state, and the agent and the sister near the common property in this State, all looking alike to a sale of the united interests in the immediate future for the best price obtainable,—materially differentiating circumstances in view of which the letters conferring the power were written. These circumstances are entitled to great weight in ascertaining the intent of the principal as to the extent of the power. The principal a thousand miles away was confident that his brother and sister, acting for him the same as for themselves, would do only what in their judgment was best for all. Hence the discretionary power with which the brother was invested, to sell as soon as he was satisfied he had the "top notch in price", and when so satisfied to "close the deal."

It is said that John was a special agent having special and limited authority, and that the orator must be taken as having had full knowledge of the extent of his power when the contract in question was made; that this being so the orator knew the agent was authorized to sell the property only to the highest bidder, which he did not do; and consequently the orator in procuring the contract of sale was aware of such misconduct by the agent in the matter of his agency as precludes it from obtaining a contract that should be binding upon the principal.

It cannot be doubted that the law requires the utmost good faith from agents (*Noyes* v. *Langdon*, 59 Vt. 569, 10 Atl. 342, 343); nor that an agent invested with special and limited powers cannot bind his principal in any act not warranted by the express authority delegated to him and what was necessarily incident thereto, that he may perform the act to which his agency applied (*Riley* v. *Wheeler*, 44 Vt. 189); nor that a party dealing with such agent is chargeable with knowledge of the limitations of his authority. *Ferguson* v. *Phoenix Mut. Life Ins. Co.*, 84 Vt., 350, 78 Atl. 997. The question then is, Was the agent guilty of misconduct in the performance of the duties of his agency?

The record shows that through the spring of 1905 defendant Eastman also had negotiations with John and his sister Charity for the purchase of the common property owned by them and Carlos, and knew John and his sister were in correspondence with Carlos about the same, and had received written communication from him that he was willing to sell the lands for the best

price which could be obtained; that Eastman, being aware of the negotiations with the orator and its offer of six thousand dollars, made an offer of sixty-three hundred dollars; that on May 31, 1905, John told Eastman that he would not close any trade with the orator until he had given Eastman a chance to raise any offer the orator might make, and that if the orator offered as much or more than sixty-three hundred dollars he would give Eastman a chance to raise his bid; that soon after the aforementioned offer by Eastman, John informed the orator thereof, and on the forenoon of June first Mr. Robinson, acting with full authority for the orator, went to Charity's house and informed her and John that the orator would pay sixty-three hundred dollars for the premises and that if this offer was not then and there accepted, he was directed to withdraw it and end the matter so far as the orator was concerned; that thereupon John and Charity consulted together and while this consultation and the negotiations with Robinson were in progress, a son of John, at the request of his father, went to Eastman's quarry, a short distance away, looking and inquiring for Eastman, but neither finding him nor learning his whereabouts, returned to the house and so reported; that thereupon John for himself and purporting to act for Carlos, and Charity for herself, and the orator by its said agent, signed the contract in question, John and Charity being afraid that if the matter was not then closed, the trade might fall through and all sale be lost. The master states that he is unable to find from the evidence that John acted in bad faith toward his brother or received any consideration other than that stipulated in the contract. Moreover, in the absence of any finding to the contrary, it will be presumed that in making the contract he acted in good faith. *Gaither* v. *Myrick*, 9 Md. 118, 66 Am. Dec. 316; *McCarthy* v. *White* 21 Cal. 495, 82 Am. Dec. 754; *Beattie* v. *Beattie*, 83 Hun. 295, affirmed 153 N. Y. 652. The letters creating the agency contemplated a private sale of the property for the highest price possible; six thousand dollars already named or as much more as should be offered. But it is important to note that the agent was given discretionary power to determine when the "top notch in price" had been offered, and when "satisfied" it had been, to close the trade. The fact that Eastman had offered the same sum

that was finally accepted in the sale to the orator does not militate against the agent's justification in selling the property without further delay.  True he had told Eastman that he would not close any trade with the orator without giving him a chance to raise any offer the orator might make, and he endeavored to communicate with Eastman, presumably to give him such an opportunity, but Eastman was not found nor his whereabouts learned.  As bearing upon the action of the agent in accepting the orator's offer, it is important to note how the matter would have then stood, had all negotiations with the orator been ended by a withdrawal of its offer, as not accepted.  So far as appears the agent had never been given any assurance or intimation by Eastman that he would raise his bid.  Indeed, the negotiations with him might also end without a sale being effected; for they had not gone beyond an offer which could be withdrawn at any time before it should be accepted and steps taken, as required by the Statute of Frauds, to make a binding sale.  At best, with the orator excluded as a would-be purchaser, the matter would stand solely on Eastman's offer with no likelihood of its being raised, and a possibility of its withdrawal altogether.  Was there not reason to fear that unless the matter was then closed all opportunity to sell might be lost? Evidently Carlos anticipated a condition of things involving such danger when instructing his agent.  Advising the acceptance of the orator's offer of six thousand dollars "at once", he said (letter of May 25, 1905), "We might do better if we worked the Columbian and Vermont Marble Co. against each other, asking each to give best bid at once.  But we might lose. Father used to say it is a good time to sell when you get a good price."  It is not unreasonable to suppose that these expressions of Carlos had great influence upon the mind of John in the exercise of the delegated power.  Can it be said that in the condition of things then confronting him the latter was not justified in thinking that the orator's offer then under consideration would not be exceeded, and in closing the sale on that basis? We think not.  And we further think that in so doing he was acting strictly within the discretionary powers delegated to him, and that the principal was bound thereby.

The very early case of *Cevil* v. *Rich*, 1 Ch. Cas. 309, is much

in point. There the question was on a will, whereby after other bequests the clause was added, "All the rest of my lands, goods and personal estate I give to A. B. on trust to give my children and grandchildren according to their demerits." The devisee, who was heir and executor, gave the land to one, omitting the rest. And the question was, whether that was a disposition according to the trust, and was much argued. The Lord Chancellor said he could not alter the settlement of the lands on one and not all; that it was clear the children were not to come in by the will immediately, but by the act of the devisee; and he was to give or distribute according to their demerits; therefore he was the judge.

In *Peay* v. *Siegler*, 48 S. C. 496, 59 Am. St. Rep. 731, the letters conferring authority on the agent to sell certain land, upon certain terms therein specified, as a restriction used these words: "Of course I want a reliable purchaser, one whom you think would make his payment promptly." The agent made a contract for the sale of the land accordingly, but the principal rejected the contract because he did not think the purchaser reliable. The court said the principal in making this requirement defined what he meant by a reliable purchaser, as one whom the agent thought would make his payments promptly; that the agent so regarded the purchaser, and the contract was binding. In *Adams* v. *Capron & Co.*, 21 Md. 186, 83 Am. Dec. 566, defendant Adams, a beef packer, consigned a lot of beef to Huth & Co. in London. The plaintiffs, Capron & Co., were correspondents of the London firm, and the nature of their relations was such that shipments by the consignor to the consignee were made under the guaranty of Capron & Co. The latter made an advancement to the consignor on account of this consignment of beef to London and took his receipt upon which the action was brought, acknowledging receipt of the money on beef so shipped for sale for his account, and promising to refund any deficiency that might arise therefrom. Before the beef arrived in London the consignor wrote to the consignees stating he had sent the beef, etc., continuing, "I trust to your good management in its disposition; do with it just as if it were your own." It appeared that the market was very dull and sales difficult; that the consignees used every endeavor

to sell the beef at the earliest moment and for the highest price possible; that they used the best management in its disposition, but that notwithstanding this, the sum for which it sold was much less than the amount of the advances. The consignor submitted an instruction to be given to the jury, but not given, to the effect that if it appeared that the beef remained in the hand of the consignees until its quality deteriorated, and the prices became lower so that it could be sold for only about two-thirds of its invoice price, they should not have sold it until they had notified him. Thereon the court said, that he appears to have made the consignment without any restrictions, and also to have authorized his consignees to deal with it as their own; that under these circumstances it is difficult to perceive upon what ground he was entitled to notice from them of its depreciated value before selling it. See also *McNeil* v. *Sherley,* 33 Cal. 202; *Betts* v. *Planters, etc. Bank,* 3 Stew. (Ala.) 18; *Leserne* v. *Cook,* 16 La. 68.

It is argued that the contract in question was obtained by the exercise of what amounted to duress upon the agent by the orator, in that when he signed the contract, he was acting under a fear that he would lose the deal if the contract be not concluded at once, by reason whereof he was not in the exercise of his free judgment, and that therefore specific performance should not be ordered. In making its offer the orator had a right to limit the time (*Carr* v. *Duval,* 14 Pet. 77, 10 L. ed. 361), and the place (*Eliason* v. *Henshaw,* 4 Wheat. 225, 4 L. ed. 556) of acceptance, and to make a binding contract the offer had to be accepted according to the terms specified. *Ellis's Admr.* v. *Durkee,* 79 Vt. 341, 65 Atl. 94. The question of acceptance was one entirely with the vendors, acting personally, or through a representative; and the record shows no ground for saying that they were devested of independent action or the free exercise of judgment; nor that the contract was not fair, equal, and just in its terms.

It is further argued that the orator has in effect accepted a return of the earnest money paid at the time of signing the contract, in applying the same to the price of the undivided interests conveyed by John and Mrs. Burr, and that this may at least be said to amount to a waiver of its advantages under

the contract.   The force of this argument, if it has any, quickly vanishes, however, when we consider that the contract was with all the co-tenants together, for the common property as a whole, and that the part payment was made on the whole purchase.   The contract became binding when signed by the parties.   Thenceforth equity regarded it, so far as the interest or estate in the land is concerned, not as executory, but as executed, and as operating to transfer the estate from the vendors and vest it in the vendee.   The equitable estate thus vested in the orator is commensurate with that provided for by the contract; and although the vendors remained the owners of the legal estate, they held it as trustees for the orator, the holder of all beneficial interest.   The power to convey the property was not delegated by Carlos.   No one could sign a deed for him, to carry out the contract, and he refused to join with his co-tenants in the deed sent him for that purpose.   Thereupon his co-tenants, in part performance of the contract, executed and delivered to the orator a deed of two undivided third parts of the premises and received the sum of four thousand dollars which, with the part payment already made under the contract, amounted to two-thirds of the entire purchase money.   And the question here is, Shall that contract—not some other contract pertaining solely to Carlos' several interest—be fully performed?

The trust impressed upon the legal estate held by the vendor followed it in the hands of his grantee Eastman, unless he was a *bona fide* purchaser for value, without notice of the orator's equitable title.   It is found that about the time the contract with the orator had been signed, and before the orator's agent had left the room where the signing was done, Eastman came into the house and into that room and learned in a general way from those present what had occurred and that in terms the whole property was contracted to the orator; that Eastman did not before nor then learn just what authority John had to sign his brother's name, but he knew that John claimed the right to sign a contract for his brother in the sale of the premises. Yet neither then nor at any time thereafter were inquiries made by Eastman respecting the nature or extent of the authority John had or claimed to have to act as agent in the transac-

tion.   It is clear that the facts learned by Eastman on the occasion last mentioned were sufficient to put him upon inquiry respecting the contract in question and the authority from Carlos under which it was signed for him.   Failing to inquire, Eastman was chargeable with notice of the agent's powers and of the orator's equitable title under the contract (*Allen* v. *Gates,* 73 Vt. 222, 50 Atl. 1092); and being so chargeable he stands in the place of his vendor and is as much of a trustee as he was.   *Story* v. *Lord Windsor,* 2 Atk. 631; *Murray* v. *Ballou,* 1 Johns. Ch. 566.   Thus standing in the vendor's place as trustee he is liable to the same equity, and should be required to convey the property thus held by him in trust to the orator, in the same manner and to the same  extent as the vendor would be liable to do in performance of the  contract in question, were he in life and still owner of  the legal estate.   *Wilkins* v. *Somerville,* 80 Vt. 48, 66 Atl. 893, 11 L. R. A. (N. S.) 1183, 130 Am. St. Rep. 906; *Van Dyke* v. *Cole,* 81 Vt. 379, 70 Atl. 593.

The decree below, however, being in accordance with the amended prayer, goes further than this.   It also declares the deed of conveyance under which Eastman took the legal title to be of no force and effect as against the orator.   This renders the decree inconsistent with itself, for if Eastman took nothing by the deed, how can any conveyance by him give the orator the legal estate, or effect complete performance of the contract? In law a contract for the sale of land is wholly, and in every respect, executory; the vendor remains to all intents the owner of the property, and can convey it free from any legal claim or incumbrance; and the vendee acquires no interest whatever in the land.   The relations between the parties are personal, merely.   And if the grantee of the legal estate is a *bona fide* purchaser for value, without notice of the equitable title under the prior contract, the legal ownership is sufficient in equity to cut off the equitable estate.   Pomeroy's Con. Sec. 314.   Furthermore, if the second purchaser takes his conveyance with notice of the trust, the *cestui que trust* may either follow the trust property in the hands of the purchaser, or he may call upon the trustee to account for the purchase money, thereby affirming the sale.   2 Spence Eq. Jur. 310; *Murray* v. *Ballou,* cited above. But the *cestui que trust* has not an absolute equitable right

against the seller or his grantee, until he pays the purchase money specified in his contract. 2 Spence Eq. Jur. 310. It cannot be said therefore that the deed of conveyance to Eastman is of no force and effect as against the orator. It had the effect to convey to him all the vendor's interest in the land, by reason whereof, this suit being solely for the completion of the title in the orator, the vendor was not a necessary party. *Van Dyke* v. *Cole,* cited above.

It follows that the decree, altered in the respect named, should be affirmed.

*Decree affirmed and cause remanded with mandate.*