UNITED STATES of America, Appellee,

v.

William F. HASENSTAB, Appellant.

No. 613, Docket 77–1442.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1978.

Decided April 24, 1978.

Richard Friedman, New York City (Friedman, Friedman, Levy & Bottiglieri, P.C., New York City, of counsel), for appellant.

T. Barry Kingham, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty. and Robert J. Jossen, Asst. U. S. Atty., Southern District of New York, New York City, of counsel), for appellee.

Before HAYS and GURFEIN, Circuit Judges, and BRYAN, District Judge.*

GURFEIN, Circuit Judge:

William Hasenstab appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York on October 6, 1977, following a five-day jury trial before the Honorable Robert J. Ward, *United States District Judge*.

An indictment, filed on July 5, 1977, charged the defendant Hasenstab in three counts with mail fraud, wire fraud and conspiracy, in violation, respectively, of Title 18, United States Code, Sections 1341, 1343 and 371. The jury returned a verdict of guilty on all counts.[1]

The Government's proof at trial demonstrated that from 1968 through 1976 William Hasenstab, a purchasing supervisor for Pan American World Airways, Inc. ("Pan American"), received about $50,000 in secret cash kickbacks from his co-conspirator George Barney, who testified for the Government. Barney, the president of Tabulating Stock Forms, Inc., a company which

---

* Honorable Frederick vanPelt Bryan, United States District Judge for the Southern District of New York, sitting by designation. Judge Bryan concurred in the opinion before his death.

1. On October 5, 1977 the District Court imposed a sentence of six months imprisonment on Count One, two years probation on Count Two, and a fine of $7500 on Count Three.

supplied Pan American with printed business forms, paid Hasenstab the kickbacks in return for Hasenstab's efforts to see that Tabulating received favored treatment from Pan American. In furtherance of the kickback scheme, Barney submitted bills to and received payment from Pan American through the mail. Barney also made periodic telephone calls between New York and Pan American's computer center at Rockleigh, New Jersey.

Barney met Hasenstab in 1967 when the defendant was a buyer of business forms at Pan American. During the next three years, Barney sold forms to Pan American through Hasenstab and, in appreciation for the business he received, Barney paid Hasenstab approximately fifty to one hundred dollars, once or twice each month. Due to labor trouble in 1970, Barney was unable to take new orders from Pan American. When Barney resumed active business with Pan American in 1972, Hasenstab told Barney that he liked their payoff arrangement, expected it to continue, but would be satisfied to receive only what Barney thought Hasenstab's services were worth. Barney told Hasenstab he would pay him 5% of the total dollar sales by Tabulating Forms to Pan American.

Between 1973 and 1976 Pan American's purchases from Tabulating Forms rose from $68,648 to $498,659, annually. In return for this substantial business, Hasenstab received something on the order of $50,000 in cash, with payments made on a monthly basis. The kickbacks were delivered by Barney to Hasenstab at various places: the Pan Am Building in Manhattan, Hasenstab's office at JFK Airport, and the Hamilton House restaurant in Brooklyn. Following Barney's arrest by the FBI in late 1976 for different offenses, two of Hasenstab's meetings with Barney were recorded with Barney's consent.[2] At the first of the recorded meetings, on December 1, 1976, Barney paid Hasenstab $1,000 in cash at the Hamilton House in Brooklyn. Because $3,000 was due on the schedule of payments for that month, Hasenstab expressed dismay, but recognized that it was the first time that Barney was short. At the second recorded meeting on January 6, 1977, Barney said he could not pay because he had not received payment from Pan American on certain orders. Hasenstab again complained, adding that Barney was getting him used to a "life style."

In return for the secret kickbacks, Hasenstab also helped Barney to fix price levels and to rig bids without competition. This practice contrasted with the normal purchase of business forms at Pan American by competitive bidding. Usually, Walter O'Toole, the Purchasing Manager, would refer Pan American's requisitions for business forms to Nicholas DiNapoli, a senior buyer. DiNapoli would distribute the requisitions among the buyers, including himself. The assigned buyer would solicit price quotations and select the supplier. The completed paperwork would then be sent for approval to Hasenstab, the Purchasing Unit Supervisor, and the order would be made final. The business with Barney's company was handled differently, however. DiNapoli testified that for about 60% of orders placed with Barney's firm, Hasenstab himself informed DiNapoli what prices and which "competitors" to enter on the bid quotation sheets, with Barney's price invariably appearing as the lowest. DiNapoli did not know whether Hasenstab actually obtained quotations, but he followed Hasenstab's orders, assuming that Hasenstab, an experienced printed forms specialist, knew what he was doing. Moreover, as a "management" employee, Hasenstab was not permitted to fill out the bid sheets for orders. All such "productivity work" had to be done by union employees like DiNapoli. Hasenstab was thus able to make it appear as if it was DiNapoli who had actually obtained the bid quotations.

In addition to routine orders, Pan American also had several long-term contracts with suppliers of printed forms. One of these was for the computer paper which was used by Pan American's data processing facility at Rockleigh, New Jersey. For

---

2. Tape recordings of the meetings were introduced in evidence and played for the jury.

the supply of paper in 1975, this contract had been awarded to Moore Business Forms, one of the nation's largest suppliers. However, during 1975, Hasenstab arranged for Barney's company to supply about half the year's remaining requirements for such paper. That contract was awarded without any competitive bids. Shortly thereafter, Barney's company was favored with the *entire* contract for the next year, 1976, worth about $300,000, as an "extension" of the improperly obtained 1975 contract. All of these arrangements were made by Hasenstab at a time when he was receiving cash payments from Barney ranging between $1,000 and $2,000 a month.

Throughout the period 1968 to 1976, Pan American mailed payments, and Barney sent invoices, bills and confirmations of the rigged orders through the mail. In addition, Barney used the telephone between New York and Rockleigh, New Jersey to expedite his business with Pan American's computer center, and on occasion called Hasenstab in New York from Rockleigh in order to facilitate the placing of orders and payment of invoices.[3]

Appellant's principal claim is that the evidence failed to establish that use of the mails and interstate telephones was suffi-ciently connected to his scheme to defraud to support a conviction under the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343 and 2.[4] He does not dispute with any vigor that the scheme was fraudulent but says that there was no *federal* crime. He contends that the only mailings were between Pan American and Tabulating Forms and that these were routine in nature, of the sort that would have taken place if there had been no fraudulent scheme whatever. He asserts that "neither the checks . ., the invoices, or purchase orders served any purpose in relation to the basis of the fraud claimed to be against Pan Am". The fraud, he submits, was his acceptance of kickbacks without the knowledge of Pan Am, *after* the mailings occurred.

Appellant misses the point that the essence of the scheme to defraud Pan Am was the creation of a system under which Pan American would buy forms and paper from Barney's company that it would normally have purchased elsewhere. Carrying out the scheme foreseeably involved use of the mails in the sending of invoices by Tabulating Forms to Pan Am, the return of payments by mail from Pan Am, and the consequent payment of the commercial

3. In an effort to help Barney disguise the kickbacks, Hasenstab at first suggested putting his own wife on Barney's payroll. He also gave Barney blank receipts from a restaurant near Hasenstab's office so that Barney could take false tax deductions for entertainment expenses for the money given to Hasenstab. To cover his own part in the scheme, Hasenstab filed false conflict of interest forms with Pan American. On those forms, Hasenstab falsely swore that he had not received any personal benefit apart from his salary for his work at Pan American, thus concealing from his employer the fact that he had received thousands of dollars from Barney on a regular basis.

4. 18 U.S.C. § 1341 provides in part:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."
18 U.S.C. § 1343 provides:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."
Under 18 U.S.C. § 2, anyone who "abets, counsels, commands, induces or procures" the commission of a federal offense, or "willfully causes" such an offense to be committed is punishable as a principal.

bribe. In effect, appellant and Barney were setting up a new business between Pan Am and Tabulating Forms with the direct purpose of benefiting themselves to the detriment of Pan Am.

■ To sustain a conviction under the mail fraud statute, "It is enough that [the defendant] participated in the scheme and that it was foreseeable that the scheme would involve use of the mails." *United States v. Finkelstein*, 526 F.2d 517, 527 (2d Cir. 1975), *cert. denied sub nom. Scardino v. United States*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). We have since reaffirmed that rule in *United States v. Cyphers*, 556 F.2d 630, 634 (2d Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977). In this case, as we shall see, the mailings were, moreover, actually in furtherance of the scheme to "earn" the kickbacks by the betrayal of Pan Am.

■ Appellant relies upon *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), but that case is not in point. There, officers and managers of recording companies kept sales off the books and retained the cash to make illegal payments to disc jockeys and program directors of radio stations. The Government charged them with using mail and wire communications to impede the functions of the IRS and to defraud artists and publishers of their royalties. The only mailings relied upon by the Government were of packing slips listing the records shipped. The essence of the scheme was the failure to record the sales on the books. The packing slips were a routine part of shipping records and had nothing to do with increasing or diminishing the number of records shipped. The mailings themselves were legitimate as well as routine. They were unrelated to the scheme to withhold some of the cash proceeds.

On the contrary, here the mailings were products of the fraud itself. Barney's sales to Pan Am were a direct, not incidental, result of the scheme.

Appellant's reliance on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1975) is also misplaced. There the Court held that the defendant's scheme to defraud a bank by using a stolen credit card ended when he used the card to pay motel bills. The mailings of invoices and payments between the motels and the bank which issued the credit card were not in furtherance of the scheme because, as the Court observed, the purpose of mailing the invoices was to adjust accounts between the various victims of Maze's frauds, and there was "no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." 414 U.S. at 402, 94 S.Ct. at 649. Here, the obtaining of money to generate the kickbacks for appellant—the essence of the scheme—required the use of the mails.[5]

■ The evidence of use of interstate telephones was also sufficient to sustain Hasenstab's conviction on Count Two. Barney testified that he spoke by telephone from his office in New York City with Sol Welger at the Rockleigh, New Jersey computer facility several times a week and, on one occasion, called Hasenstab in New York from New Jersey. The purpose of each of these interstate phone calls was to regulate and control the paper contract between Tabulating and Pan American. Thus, the telephone was used in furtherance of the fraud because it was necessary for Barney to insure the continued receipt of requisitions from the New Jersey facility under the long-term computer paper contract which was "negotiated" by Hasenstab. The taped luncheon conversations between Hasenstab and Barney revealed that Hasenstab knew this, and that he was getting payments on a percentage basis, depending upon the amount of paper delivered under the contract which had been obtained by

---

5. Appellant also cites *United States v. Staszcuk*, 502 F.2d 875 (7th Cir. 1974), *modified on other grounds in banc*, 517 F.2d 53 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). There, in connection with the bribery of an alderman to change the zon-ing laws with respect to certain property, a committee of the City Council mailed form notices for a public hearing to adjacent owners. This was the only "mailing" charged. The mailings were obviously not in furtherance of the fraud, and the Seventh Circuit so held.

fraud. Barney's use of the telephone facilitated that process.

■ Hasenstab contends further that it was plain error for Judge Ward to allow the Government to elicit on the direct examination of its principal witness, Barney, an admission that he was guilty of similar commercial bribery schemes with others. Appellant suggests that his own association with Barney, a "bad man", spilled over to him unfairly, leading the jury to believe that he should be judged by the company he kept.

This is an old argument. Nothing disturbs a defense lawyer more than, when, for example, he has a record of conviction in his file ready to use in cross-examination, the Government uses it first. Permitting the Government to use it first does not turn on the extent to which a party may impeach his own witness on credibility. It is bottomed, rather, on a different theory. If the prosecution failed to elicit the impeaching evidence in the first instance, the jury might improperly assume that the Government was intentionally hiding it. *See United States v. Rothman*, 463 F.2d 488, 490 (2d Cir.), *cert. denied*, 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231 (1972); *United States v. Del Purgatorio*, 411 F.2d 84, 87 (2d Cir. 1969). In any event, it is long settled that the Government may proceed in this way, and that when no request is made for a cautionary instruction, such instruction need not be given. Here there was no request.

We have examined with care the attack on Judge Ward's charge and find nothing which merits discussion. We have examined the other claims of error and find them insubstantial.

The conviction is affirmed.