**UNITED STATES of America, Appellee,**

v.

**Charles L. STARR, Jr., and Charles L. Starr, III, Defendants-Appellants.**

**Nos. 122, 123, Dockets 86–1219, 86–1220.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1986.

Decided April 9, 1987.

Robert B. Hemley, Burlington, Vt. (Gravel and Shea, Burlington, Vt., of counsel), for defendants-appellants.

Christopher B. Baril, Asst. U.S. Atty., D. Vermont, Rutland, Vt. (George W.F. Cook, U.S. Atty., Kenneth J. Melilli, Asst. U.S. Atty., D.Vt., Rutland, Vt., of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of conviction entered on May 2, 1986, in the United States District Court for the District of Vermont, Billings, J., after a jury trial.

The jury returned a verdict of guilty on all counts under a fifteen count indictment charging defendants Charles L. Starr, Jr. and Charles L. Starr, III with mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 (1982).[1] The indictment alleged that defendants engaged in a scheme to defraud customers of their so called "lettershoppe" business, American Mailing Systems (AMS), by means of "burying" higher rate mailings in lower rate bulk mailings and failing either to pay the postal service the correct postage due or to refund the excess funds to their customers. This appeal followed. We reverse the judgment of the district court.

## BACKGROUND

The principals in this criminal prosecution, Charles L. Starr, Jr. (Charles Starr) and Charles L. Starr, III (Larry Starr), father and son, formed Starr Industries, Inc. in 1981 and shortly thereafter began operating a lettershoppe service for bulk mail customers. In the period covered by the grand jury's indictment, September 4, 1981, through May 1984, the Starrs performed these bulk mailing services under the name American Mailing Systems.

The Starrs had no prior experience in the operation or management of a lettershoppe business. To compensate for their shortfall in practical experience, the Starrs hired Douglas Whitaker to work for and advise them in developing their business. Whitaker, an unindicted co-conspirator, testified for the government, describing the Starrs' conduct that supposedly showed a scheme to defraud their customers.[2]

Most of AMS' customers were institutional entities who advertised educational seminars. They sent unsorted, unaddressed mailing brochures to AMS in one bulk shipment. AMS addressed the bro-

1. Defendants were sentenced to two years imprisonment, fined $10,000 and each ordered to make restitution of $50,000 on count fifteen. Defendants were given three years probation on counts one through fourteen.

2. In exchange for his testimony, Douglas Whitaker pleaded guilty to one count of stealing a United States Postal Service date stamp in viola-

tion of 18 U.S.C. § 1707 and also pleaded guilty to eleven counts of violating 18 U.S.C. § 1723. After the Starrs were convicted, Whitaker was sentenced to twelve months incarceration, six months of which were to be served and the remainder suspended with one year probation. Whitaker was fined a total of $1,500.

chures, then sorted and packaged them for delivery to the post office.

AMS billed customers for sorting, labeling, packaging and handling their mailings. This charge was entered on the books as income to AMS. The customers individually calculated the postage due for their mailings based on the number of pieces to be mailed and the applicable postage rate. The customers then wrote a check payable to AMS for the cost of the necessary postage. AMS maintained these funds in a separate account. A record of such transfers was kept by Larry Starr in a notebook on his desk. As customers' mailings were dispatched to the post office, AMS paid the postage due for each customer from this separate account.

The process of actual delivery of the lettershoppe customers' mailings to the post office entailed a number of different procedures. Individual brochures were assembled in zip code order and placed into mail sacks provided by the post office. AMS presented the mailings to the postal service together with postal form 3602. This form contained the name of the AMS client, the permit number, the rate and pounds or pieces of mail included in the mailing. To verify this information, a postal employee would choose only one sack to determine its contents. When the employee was satisfied that the material in the single sack was being mailed at the proper rate, the postage due was calculated and collected for all of the sacks and they were accepted for delivery.

The Starrs' scheme to defraud lettershoppe customers, as charged by the indictment, operated as follows. Douglas Whitaker, aware of the meager verification process employed by the postal service, "buried" or concealed higher postage rate mail inside bulk rate mailing sacks. The process required the various items of mail to be strategically arranged in the sacks to avoid detection by postal employees. Fraudulent postal receipt forms (3602 forms) were then submitted to the post office and the lower postal rate for the mailing was paid for the entire shipment. AMS then prepared a second, false 3602 form to be sent to the customer, indicating that the legally correct postage had in fact been paid. The resulting surplus funds remaining in the separate AMS customer account would then be appropriated by AMS and listed on its books under fictitious income categories such as "presort income." AMS performed no legitimate labor function that justified the retention of customer funds.

The scheme netted the Starrs approximately $418,000 during the period covered by the indictment. The operation became so profitable that the Starrs carried out a similar scheme at Canadian post offices. AMS customers, however, remained blissfully ignorant of the Starrs' activities. The customers paid the postage that they themselves calculated to be legally due. Mail was sent on time and arrived at the appropriate destination. In fact, AMS customers testified at trial that they were satisfied with the service they received from AMS.[3] The customers' receipt of 3602 forms, together with their own verification that AMS delivered their mail, effectively concealed the Starrs' appropriation of customer funds.

Postal officials finally exposed the scheme in January 1984. Police conducted a search of AMS pursuant to a search

---

**3.** Dan Harding, an AMS customer, for example, testified to the following on direct examination:

Q. So to put it in the converse, as an overall review made by you, you're satisfied that the mail went out as you had directed?

A. Yes.

Q. And in connection with these mailings, you had determined in advance the amount of postage that you expected to pay in order to have these mailings sent out. Correct?

A. That's right.

Q. And are you satisfied upon reviewing your records and looking at your checks that at no time you paid anymore [sic] than the amount of postage that you had predetermined should be associated with the transmission of those mailings? Understand my question?

A. I'm satisfied that we didn't pay any more than we should have paid.

Q. So far as your companies are concerned, we can agree that you and your companies got what it paid for from American Mailing. Correct?

A. Yes.

J.App. at 63–64.

warrant and seized AMS business records. The Starrs eventually sold the business in May 1984.

On August 1, 1985, a District of Vermont grand jury returned an indictment that charged the Starrs with fifteen counts of mail and wire fraud. The indictment contained a detailed description of the alleged scheme to defraud customers. According to the indictment:

> The purpose of defendants [sic] scheme was to defraud its lettershoppe customers by inducing them, by means of false and fraudulent pretenses [sic], representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material.

J.App. at 10–11.

At trial, the Starrs moved for judgment of acquittal at the close of the govern-ment's evidence. They argued, *inter alia*, that the evidence could not support a finding that they intended to defraud their lettershoppe customers. Instead, the Starrs argued, the government at most proved a scheme to defraud the United States Postal Service. They contended that such a scheme was not properly charged by the indictment and urged the court to direct a verdict in their favor. The court, however, denied the motion. The Starrs were ultimately convicted and this appeal followed.

## DISCUSSION

Properly viewed, the Starrs' claim is one of insufficiency of the evidence with regard to the element of intent to defraud the lettershoppe customers.[4] Br. of Defendants at 17–19. Of course, our scope of

---

4. Defendants initially mount a rather aggressive, albeit disingenuous, challenge to their mail and wire fraud convictions. Defendants maintain that the government's proof is at variance with the charging document because the indictment does not charge a scheme to defraud the United States Postal Service and that such a variance must be considered fatal. The Starrs posit that the government constructively amended the indictment by pursuing a theory of the case not considered by the grand jury. Br. of Defendants at 8–16. We cannot agree.

While it is true that the grand jury's indictment, much to our dismay, does not charge specifically a scheme to defraud the postal service, the indictment does list facts necessary to find fraud either as to the letter shoppe customers or as to the postal service.

The relevant portion of the grand jury's indictment, paragraph eleven, reads as follows:

IV. *THE PURPOSE OF DEFENDANTS [sic] SCHEME*

11. *The purpose of defendants* [sic] *scheme was to defraud its letter shoppe customers* by inducing them, by means of false and fraudulent pretenses [sic], representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material. The defendants doing business as American Mailing Systems "stuffed" and "buried" higher postage rate mail within or under lower postage rate mail and failed to pay the correct postage to both the United States Postal Service and Canada Post (Canadian Postal Service—hereinafter Canada Post) and further failed to refund to the lettershoppe customers the difference between the postage due and postage actually paid. The defendants converted to the defendants' personal use and/or to the use of the subsidiaries of the Corporation named in paragraph 7 of this count, for start-up capital investment and other purposes in excess of $400,000.00 in postage monies which were due the United States and Canada Post or to the lettershoppe clients.

J.App. at 10–11 (emphasis added).

It is difficult to fathom defendants' argument that the evidence varied from the particulars in count one of the indictment. In order for the government to prove its overall theory of defrauding the customers, it was necessary to establish facts that constituted some elements of defrauding the postal service. Defendants were not, therefore, deprived of their rights to fair notice of facts the government sought to establish. Moreover, there is no danger that defendants were convicted of an offense not charged in the indictment because the jury was not instructed that defendants could be found guilty of defrauding the postal service. Judge Billings' charge to the jury was limited to the theory presented by the indictment. The court charged the jury as follows:

Counts 1 through 9 allege that the defendants schemed to defraud its [lettershoppe] customers by inducing them by means of false and fraudulent pretenses, representations, and promises and by concealing material facts to pay and prepay postage money for mailing their advertising material.

Additionally, stuffed and buried higher postage mail within or under lower postage rate mail and, failed to pay correct postage to both the United States Postal Service and the Canadian Postal Service, and further failed to refund to the customers the difference between the postage due and the postage actually paid.

review for such a claim is limited. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Nevertheless, on the basis of the record before us, we conclude that there was insufficient evidence that the object of the Starrs' scheme was to defraud their lettershoppe customers. This evidentiary deficiency applies equally to the mail fraud and wire fraud counts.

■ An essential element of the government's proof in a mail fraud prosecution or a wire fraud prosecution is proof of a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent. However, the government is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants. *Durland v. United States,* 161 U.S. 306, 315, 16 S.Ct. 508, 512, 40 L.Ed. 709 (1896); *United States v. Andreadis,* 366 F.2d 423, 431 (2d Cir.1966). No actual pecuniary injury, therefore, need result to the victim of the fraud.

■ Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent. Such was our holding in *United States v. Regent Office Supply Co.,* 421 F.2d 1174 (2d Cir.1970). In *Regent,* an indictment was handed down charging defendant with mail fraud. It appeared that defendant's salesmen engaged in aggressive marketing techniques designed to sell their products, including frequent misrepresentations of certain facts. For instance, these salesmen represented that they had been referred by a friend, that they had a large inventory to be disposed of, or that the agent was a doctor who needed to dispose of stationery. 421 F.2d at 1176. These facts, however, were only collateral to the sale and did not concern the quality or nature of the goods being sold. The misrepresentations, therefore, did not go to the basis of the customers' bargain with the salesmen. The customers received exactly what they paid for and no customer testified that he had been cheated. On the basis of these facts, we concluded in *Regent* that defendant did not contemplate an actual injury to the alleged victims of the fraud. At most, the evidence had shown an intent to deceive and to induce the customers to enter into the transaction. Absent any evidence of an intent to harm the victims, however, we concluded that the evidence was insufficient to demonstrate a fraudulent intent as required by the mail fraud statute. 421 F.2d at 1181.

■ Our decision in *Regent* identifies an important distinction that the government appears to lose sight of in this case. Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." 421 F.2d at 1182.

Proceeding now to the facts before us, we note that the government adduced no

----

. . . .
Counts 10 through 14 allege that the defendants schemed to defraud its [lettershoppe] customers by inducing them by means of false and fraudulent pretenses, representations, and promises, and by concealing material facts to pay or prepay postage money for mailing their advertising material.

Additionally, defendants stuffed and buried higher postage mail within or under lower postage rate mail, and failed to pay correct postage to both the United States Postal Service and the Canadian Postal Service, and further failed to refund to the customers the difference between the postage due and the postage actually paid.
J.App. at 65–67.

evidence of an intent to harm the letter-shoppe customers. Although all *reasonable* inferences must be drawn in favor of the government on this appeal, we are convinced that the jury must have resorted to rank speculation in finding fraudulent intent here.

The jury heard the following evidence that the Starrs practiced a deceit on their customers. The Starrs represented that funds deposited with them would be used only to pay for their customers' postage fees. In fact, the Starrs used only a portion of those funds to pay postage; the remainder was appropriated to their own use. Moreover, the Starrs caused fraudulent postal receipt forms to be sent to their customers in order to avoid detection of their scheme. Clearly, their lettershoppe customers were deceived.

■ The record, however, shows little else. Specifically, the evidence does not identify what harm, if any, the Starrs intended to inflict on their customers. In fact, proof offered on this element is quite to the contrary. The Starrs did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination. The agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the Starrs and their customers. The Starrs in no way misrepresented to their customers the nature or quality of the service they were providing. Indeed, satisfied customers were a necessary ingredient in the successful operation of their business. Therefore, because AMS customers received exactly what they paid for, there was no discrepancy between benefits "reasonably anticipated" and actual benefits received. An intent to defraud the lettershoppe customers was not demonstrated either directly or circumstantially.

We wish to address the assertion made by Judge Van Graafeiland in his dissenting opinion that customers' bargains were violated because mail was "dumped" or not mailed. Lori Lemnah, an AMS employee, did in fact testify on cross-examination by the defense that approximately thirty sacks of mail were dumped on one occasion. Tr. III–120. A full reading of her testimony, however, indicates that this occurred as a result of Douglas Whitaker's inadvertance in failing to deliver the mailing on time to the post office. Tr. III–102–04, 119–21. Testimony from this witness provides not the slightest support for the notion that the mail was dumped as part of a scheme to defraud the Starrs' customers. At most, Ms. Lemnah's testimony demonstrates that the dumping was an isolated occurrence motivated by Whitaker's desire to conceal his misfeasance from his employer, AMS. Defense counsel's purpose in extracting this testimony from a government witness was to expose Whitaker as an untrustworthy employee. The dissenting opinion does not reconcile Lemnah's testimony with the complete lack of testimony from AMS customers that they had been cheated.

Judge Van Graafeiland also argues that AMS pocketed the savings in postage gained as a result of presorting first class mail instead of refunding the difference to customers. Ms. Lemnah testified that AMS presorted mail for only one customer, Timberlane Dental Group. Tr. II–176. Postage savings with respect to the Timberlane account amounted to $60 per month. Again, however, there is no showing that this legitimate charge to a single customer operated as part of an overall scheme to defraud defendants' lettershoppe customers of over $400,000. A close reading of Lemnah's testimony reveals that the charge was justified as part of AMS' labor cost in presorting Timberlane mailings. Tr. III–2–5.

The government contends that the Starrs defeated the expectations of their customers by misappropriating funds paid to them to cover postage fees. This expectation, according to the government, was part of the bargain between AMS and its customers and resulted in an injury sufficient to support a finding of fraudulent intent. We do not agree. Although it may be assumed that the use to which the money would be put, and the concomitant expectation that it would be used for a specific purpose, implicitly constituted a part of the bargain between the parties, that defeated expecta-

tion alone would not affect the nature or quality of the services that was the basis of the customers' bargain. The misappropriation of funds simply has no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion. Nor does the government's argument explain how the Starrs *intended* the misappropriation to cause direct pecuniary harm to their alleged victims. As previously noted, an inference of such intention is unreasonable in light of the purpose of the scheme. Therefore, any "harm" intended by the Starrs is, at most, metaphysical and certainly not of the character identified in *Regent* as being sufficient to infer fraudulent intent.

The government also argues that AMS customers suffered a harm because they were entitled to a refund of monies not paid to the postal service. This argument is without merit. As between the postal service, the Starrs and AMS customers, only the postal service could legally claim a right to the unspent postage fees. The customers at that point had received the service for which they had paid. If the money not paid to the postal service were refunded to the customers, they could become accessories to the fraud committed by the Starrs unless they immediately turned over the money to the post office. Once AMS customers paid for and received the service to which they were entitled, they were in no position to claim a refund for themselves.

Judge Van Graafeiland in his dissenting opinion argues that, according to postal regulations, principals are liable for postage deficiencies caused by their agents. Under postal regulation DMM § 111.3 (1985), the mailer is "required to assure that he has complied with the prescribed laws and regulations governing domestic mail." Therefore, according to the dissenting opinion, the Starrs caused harm to their lettershoppe customers because the post office now has recourse against the customers for postage deficiencies.

The record shows, however, that AMS, and *not* the lettershoppe customer, is listed as the "mailer" on the 3602 forms that were submitted to the post office. J.App. at 211–12. Although an AMS customer is listed as the permit holder, AMS appears under the caption "NAME AND ADDRESS OF INDIVIDUAL OR ORGANIZATION FOR WHICH MAILING IS PREPARED (*If other than permit holder*)."

Furthermore, whether or not the post office has recourse against the Starrs' customers based on agency principles is irrelevant. No agency theory was included in the indictment or the bill of particulars. The theory was never argued by the government to the jury. Neither was the theory included in the jury charge. Therefore, the jury had no legal basis for inferring injury to the customers from this hypothetical recovery-over by the post office.

The dissenting opinion quotes from the mail fraud statute as follows: " 'Whoever, having devised or intending to devise any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ....* ' " (emphasis added). The dissenting opinion then argues that the italicized portion of the statute provides direct support for the jury's verdict.

We do not see how the mail fraud statute provides support for this conviction. The statute outlaws any scheme to obtain money by "false or fraudulent pretenses." Fraudulent intent is a basic element of mail fraud. We have defined fraudulent intent as requiring a contemplated harm to the victim. *See United States v. Regent Office Supply*, 421 F.2d 1174, 1182 (2d Cir.1970). Unless the dissenting opinion is prepared to say that our holding in *Regent* was directly contrary to the terms of the statute, then the jury's verdict, unsupported by evidence of contemplated injury, must fall.

The dissenting opinion also cites language in *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir.), *cert. denied*, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), for the argument that the italicized portion of the mail fraud statute encompasses the conduct of defendants in this case. In

*Rowe,* Judge Learned Hand stated that: "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *Id.* The *Rowe* case, however, was thoroughly distinguished in *Regent.* We said in *Regent* that "neither the *Rowe* case nor the language quoted will support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud." 421 F.2d at 1181. Further, in *Rowe* itself, the victims suffered a definable harm because they were induced to pay large sums of money for worthless property. After *Regent,* therefore, there can be no doubt that *Rowe* has been deprived of much of its vitality.

Although this case involves a contract for services rather than a contract for the sale of goods as in *Regent,* the evidence produced here calls for the same result. As in *Regent,* no evidence of tangible injury was shown from which the jury could infer an intent to defraud. Accordingly, "we conclude that the defendants intended to deceive their customers but they did not intend to defraud them." *Regent,* 421 F.2d at 1182. The evidence is, therefore, insufficient to support convictions for mail or wire fraud.

 We address one further point. In his charge to the jury, the district judge stated: "To act with intent to defraud means to act knowingly, and with a specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another *or* bringing about some financial gain to one's self." Supp.App. of Gov. at 200 (emphasis added). To the extent that the charge permits the jury to find an intent to defraud based solely on the defendants' appropriation of a benefit to themselves, it is error. In *Regent,* we held that "the government can[not] escape the burden of showing that some actual harm or injury was *contemplated* by the schemer." 421 F.2d at 1180. While a finding that defendants garnered some benefit from their scheme may be helpful to the jury to establish motive, it cannot be probative of fraudulent intent unless it results,

or is contemplated to result, from a corresponding loss or injury to the victim of the fraud. The district court's charge effectively permits the jury to disregard any evidence of contemplated harm and runs afoul of our *Regent* holding.

Finally, the dissenting opinion cites *United States v. London,* 753 F.2d 202 (2d Cir.1985), for the proposition that a trial judge need not charge a jury that it must find contemplated harm to infer fraudulent intent. *London* held that harm or injury can be inferred "when the scheme has such effect as a necessary result of carrying it out." *Id.* at 206. We hold only that it is error for a trial judge to charge a jury that contemplated harm is *not* an element of fraudulent intent. *London* did not eliminate contemplated harm as an element of fraudulent intent and the jury charge to that effect in our case was error.

### CONCLUSION

Evidence adduced by the government at trial was insufficient to sustain a finding that defendants intended to defraud their lettershoppe customers. Also, the district court's charge to the jury on intent to defraud is error because it permits the jury to infer such an intent based solely on defendants' appropriation of a benefit to themselves. The judgment of conviction is reversed and the indictment is dismissed.

JON O. NEWMAN, Circuit Judge, concurring:

Customers of the defendants paid them money to have a service rendered—the mailing of letters. In performing that service, the defendants defrauded the United States Postal Service by scheming to pay less than the proper amount of postage. No doubt many customers would not have wished to do business with the defendants had they known that the defendants were defrauding the Post Office in the course of performing the service the customers had purchased. And no doubt many customers would not wish to do business with the defendants if the defendants were defrauding any other person from whom the defendants obtained goods or services neces-

sary for conducting their business—the supplier of printed forms, the landlord, or the telephone company. But a customer's regret at doing business with a company that defrauds one of its trade creditors does not transform fraud upon the creditor into fraud upon the customer.

The Government has simply indicted the defendants for defrauding the wrong party. An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed. However, the indictment for defrauding the customers has led to a conviction that must be reversed, for all of the reasons cogently explained in Judge Meskill's opinion, in which I concur.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Because my understanding of the crucial facts and the law pertaining thereto differs sharply from that of my colleagues, I dissent.

### THE FACTS

Appellants' scheme, as alleged in the indictment and charged to the jury, was to defraud its lettershoppe customers by inducing them, by means of false and fraudulent pretenses, representations and promises and by concealing material facts, to pay and prepay postage money for mailing their advertising material and then converting over $400,000 of this amount to their personal use. The undisputed facts in support of this charge are:

1. Postage had to be paid in advance before the customers' brochures could be mailed.

2. Appellants promised that they would pay the postage if their customers advanced the money for this purpose.

3. Appellants pocketed over $400,000 of the postage money which the customers advanced.

I do not understand how, in the light of the foregoing undisputed facts, my colleagues can say that the Starrs "in no way misrepresented to their customers the nature or quality of the service they were providing" and that "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received."

Without belaboring the point, I simply include herewith an excerpt from the testimony of the president of one of appellants' customers and leave it to the reader to decide whether those customers received the benefits they were promised.

Q. Why is it, as you testified with AMS, you were paying them for the postage, you were issuing a check to them? How did that come to be?

A. Mr. Starr asked me to write checks directly out to his organization, as it would simplify matters, he told me. It would make it easier for them, and they would keep two separate accounts so that at any point in time I could tell just exactly how much money I had in my postage account, just as the postmaster would have done. And I agreed to that. And I might say now, quite foolishly. And not because of this case, but because, irregardless of the letter shop I made my postage checks out to, there was certainly not the trust that the post office was going to, in turn, make payments to the post office, as I had, you know, expected when the post—you know, the letter shop can do anything they want with money. They can use it to pay overhead, they can, you know, put it in their pockets and go out of business. They can do anything they like. So it was a real foolish move on my part, something we're not doing any longer.

At a later point the same witness described AMS as "our agent for transporting the money, at least I thought, from our account to the post office's account."

If the reader decides, after reading the foregoing testimony and viewing it in the light most favorable to the Government, that appellants made no false representations or promises and concealed no material facts, and that there was no discrepancy between the benefits appellants' customers anticipated and the benefits they received, the reader need proceed no further in this

opinion—appellants are innocent.[1] However, on the assumption that the reader will view the facts differently from my colleagues, I will go on to the law.

## THE LAW

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, read in pertinent part as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,....

The use of the word "or" between the two clauses signifies that they are disjunctive rather than conjunctive. *United States v. Astolas*, 487 F.2d 275, 279–80 (2d Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Accordingly, the statute is not limited to fraudulent schemes that contemplate the actual loss of money or property. *United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Castor*, 558 F.2d 379, 382–83 (7th Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978); *United States v. States*, 488 F.2d 761, 764 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). Appellants' customers were just as surely defrauded if they were deprived of their chance to bargain with all the material facts before them.

The mail fraud statute formerly was codified in 18 U.S.C. at § 338. Prior to 1899, the statute did not contain the clause "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." These words were added by statutory amendment at the turn of the century, and the reason for the addition was aptly described in *Moore v. United States*, 2 F.2d 839, 841 (7th Cir. 1924), *cert. denied*, 267 U.S. 599, 45 S.Ct. 354, 67 L.Ed. 807 (1925):

The added words were evidently intended to enlarge the scope of the act, and to denounce and punish the use of the mails in execution not only of a scheme to defraud, but also of a scheme to obtain money or property by means of false representations or promises, and would in its terms include any scheme to obtain money from another by means of false pretenses, under circumstances where, but for the false pretenses or promises, the money or property would not have been parted with.

In *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir.), *cert. denied*, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), Judge Learned Hand, citing the *Moore* holding with approval, said:

Civilly of course the action would fail without proof of damage, but that has no application to criminal liability. A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.

In *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir.1970), the case much relied upon by the majority, Judge Moore, referring to *Rowe*, said:

Thus, taken in its factual context, the formulation of law stated in the *Rowe* decision was perfectly accurate in affirming that a wrong has been suffered when a man is deprived of his chance to bargain "with the facts before him" where the absent facts are facts material to the bargain he is induced thereby to enter.

See also *United States v. Rodolitz*, 786 F.2d 77, 80–81 (2d Cir.1986), where we said:

---

1. In order to arrive at a correct decision, the reader should know that every question by defense counsel concerning customer satisfaction was related to and based upon the customers' assumption that all of the mail for which they had paid postage to appellants went out. No customer testified that he was satisfied with the fact that appellants had embezzled over $400,-000 of customer money. Unlike my colleagues, the jury was not taken in by this clever questioning ploy of the defense lawyers.

To sustain the conviction the government needed to prove only that Rodolitz employed a deceptive scheme intending to prevent the insurer from determining for itself a fair value of recovery.

In *United States v. Hasenstab*, 575 F.2d 1035 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978), defendant, a purchasing supervisor for Pan American World Airways, Inc., received kickbacks from suppliers of business forms. The Court did not indicate in its opinion that Pan American paid excessive amounts to the suppliers. We held, nonetheless, that the essential element of the scheme to defraud "was the creation of a system under which Pan American would buy forms and paper from Barney's company that it would normally have purchased elsewhere." *Id.* at 1038. *See also United States v. Bryza*, 522 F.2d 414, 422 (7th Cir.1975), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Fischl*, 797 F.2d 306, 311 (6th Cir.1986).

The testimony in the instant case shows that AMS sent its customers no written bills for postage. Instead, "Larry Starr would call them up and tell them that your mailing is going out tomorrow, please wire us so much money." When the check for postage came in, it would either have the word "postage" written on the memo portion of the check, "[o]r they would attach a little note with a check saying, 'This check is for our postage mailing that's going out at the end of the week,' or something like that." In one case, however, the customer opened a special bank account and gave Charles Starr authorization to write checks on that account.

I think it clear that AMS acted as an agent for the delivery of its customers' postage money to the post office and, as such, owed them the fiduciary duty of honesty and good faith. "An agent is a fiduciary with respect to the matters within the scope of his agency." Restatement (Second) of Agency § 13. "The law requires the utmost good faith from agents. The relation is one of trust and confidence, and an agent will not be permitted to make profit for himself in the transaction of the business of his principal." *Noyes v. Landon*, 59 Vt. 569, 574, 10 A. 342 (1887). *See also Vermont Marble Co. v. Mead*, 85 Vt. 20, 28, 80 A. 852 (1911); 2A C.J.S. Agency §§ 4a, 5. Moreover, where, as here, money is placed in the hands of another earmarked and kept separate for delivery to a third party, a trust will be imposed on the funds for the accomplishment of the intended use. *McKee v. Lamon*, 159 U.S. 317, 322, 16 S.Ct. 11, 13, 40 L.Ed. 165 (1895); *Carrier Corp. v. J.E. Schecter Corp.*, 347 F.2d 153, 155 (2d Cir.), *cert. denied*, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.*, 140 F.Supp. 739, 749 (E.D.Tenn.1953), *aff'd*, 232 F.2d 930 (6th Cir.1956).

"There is abundant authority that a scheme to use a private fiduciary position to obtain direct pecuniary gain is within the mail fraud statute." *United States v. Dixon*, 536 F.2d 1388, 1399 (2d Cir.1976) (*citing United States v. Buckner*, 108 F.2d 921, 926–27 (2d Cir.), *cert. denied*, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940), and *United States v. Groves*, 122 F.2d 87 (2d Cir.), *cert. denied*, 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941)). The failure of a fiduciary to disclose material information, where the failure to disclose could result in harm to his principal, also violates the mail fraud statute. *United States v. Weiss*, 752 F.2d 777, 784 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Siegel*, 717 F.2d 9, 14 (2d Cir.1983) (*citing United States v. Newman*, 664 F.2d 12, 19 (2d Cir.1981)).

Appellants' failure to disclose that they did not pay or intend to pay the correct postage that was owed by their customers could indeed result in tangible harm to the customers. As every layman knows, postage must be fully prepaid on all mail at the time of mailing. *See* 39 C.F.R. Pt. 3001, Subpt. C, App. A § 3000.010. The jury was informed that there are three methods of demonstrating prepayment of postage for presorted third-class mail—adhesive stamps, metered stamps, or permit imprints. "Permit imprints are printed indicia indicating postage has been paid by the sender under the permit number shown."

39 C.F.R. Pt. 3001, Subpt. C, App. A, General Definitions .07. We are concerned in this case only with permit imprint mailings. A permit to use imprints is obtained by applying to the post office where mailings are to be made and paying a prescribed fee. Upon issuance of the permit, the post office opens an advance deposit trust account for the permit holder against which drawings are made for postage. Each piece of mail sent under permit must bear the permit imprint which indicates that postage has been paid, and the postage must be charged against the permit holder. For this reason, each "Statement of Mailing with Permit Imprints", Form 3602, must contain the name and address of the permit holder.

AMS had a permit to use imprints. So also, however, did many of its customers. Although AMS insisted that all of its customers' postage checks be made payable to it, when it used a customer's permit number, as it often did, it channeled the postage money through that customer's advance deposit trust account. This was done by drawing against AMS's account, depositing the withdrawn funds in the customer's trust account and immediately withdrawing the funds from the latter and redepositing them in the former. In this manner, the post office was able to identify the customer and establish whether it was complying with all its permit requirements. The customer's permit would be revoked if it was used in operating any unlawful scheme or for any noncompliance with the regulations governing the use of permit imprints. *See* Domestic Mail Manual (DMM) § 145.2.22.

AMS processed both regular and nonprofit bulk mail for its customers. One of its nonprofit mailers, the American Institute for Professional Education, mailed between 12 and 15 million pieces of mail a year. "Nonprofit bulk mail is third-class mail mailed by authorized nonprofit organizations or associations of the following types [religious, educational, etc.]." 39 C.F.R. Pt. 3001, Subpt. C, App. A § 300.-0212. *See also* DMM §§ 623.1, 623.2.21. When AMS processed mailings for the American Institute, or any of its other non-profit customers, it used the customer's mailing permit. A Form 3602 had to be prepared and signed by either the "Permit Holder or Agent". In almost every case, the Statement was signed by an AMS representative as Agent for the Permit Holder. Each Form 3602 carried a clear printed warning that "[b]oth principal and agent are liable for any postage deficiency incurred." Unlike my colleagues, I am prepared to assume that the jurors could read the numerous Form 3602's that were placed in evidence, and that the most untutored among them knew what was meant by the simple statement that both principal and agent were liable for postage deficiencies.

Once the trier of fact has found for the Government, all permissible inferences must be construed in favor of the Government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985). Instead of discussing the above-quoted Form 3602 clause and the only logical conclusion the jury could draw from it, my colleagues simply disregard it. They say that whether or not the post office has recourse against appellants' customers is "irrelevant". Perhaps it is this strange logic which leads them to conclude that the only harm in this case is "metaphysical".

My colleagues also disregard the provisions of the mail regulations which provide that nonprofit bulk mail is third-class mail "mailed" by authorized nonprofit organizations and which forbid such organizations to "mail" at the special rates unless their applications to "mail" at the special rates are approved. *See* 39 C.F.R. Pt. 3001, Subpt. C, App. A § 300.0212; DMM §§ 623.1, 623.2.21, 642.4. The DMM provides that, "[n]otwithstanding any statement contained in this manual or the statements of any employee of the United States Postal Service, the burden rests with the mailer to assure that he has complied with the prescribed laws and regulations governing domestic mail." DMM § 111.3. Nonprofit organizations, such as the American Institute, cannot escape their

designation as "mailers" by using the services of AMS. As a result of the majority's unfortunate holding that appellants' customers got everything to which they were entitled, if the post office decides to seek recovery of the underpayments from "mailers" such as the American Institute, these "mailers" surely will be met with the defense of collateral estoppel if they attempt to claim over against appellants. *See, e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

## THE CHARGE

In instructing the jury concerning the law which is pertinent on this appeal, the district judge commenced his discussion by reading 18 U.S.C. §§ 1341 and 1343, the statutes which appellants were charged with violating. This was perfectly proper. *Williams v. United States,* 328 F.2d 256, 262 (8th Cir.), *cert. denied,* 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964); *Smith v. United States,* 269 F.2d 217, 218 (D.C.Cir.), *cert. denied,* 361 U.S. 865, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959); *Maynard v. United States,* 215 F.2d 336, 339 (D.C.Cir.1954). Then, with the obvious assistance of Devitt and Blackmar's authoritative work, *Federal Jury Practice and Instructions,* he paraphrased and enlarged upon the statutes, referring first to the mail fraud statute and then in identical language to the wire fraud statute:

> In order to establish that the defendants are guilty of mail fraud, the government must prove beyond a reasonable doubt, first, that the defendants made up a plan or scheme which was reasonably calculated to defraud another or for obtaining money or property by means of false pretenses, representations, or promises; second, that for the purpose of carrying out the scheme or attempting to do so, the defendant used the United States mails or caused the United States mails to be used in the manner charged in that particular count; and *third, that the defendant did so knowingly and*

*with intent to defraud.* (emphasis supplied).

He then charged:

> The word scheme includes any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses, representations or promises money or property from persons so deceived.
>
> A statement or representation is false or fraudulent if it relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with an intent to defraud.

He continued:

> A statement or representation may also be false or fraudulent when it constitutes half a truth or effectively conceals a material fact with intent to defraud.
>
> A material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction. To act with intent to defraud means to act knowingly, and with a specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

Finally, the court said:

> The mail fraud statute can be violated whether or not there's any loss or damage to the victim of a crime.

Reference to Devitt and Blackmar will disclose that the district judge hewed closely to their recommended instructions. While these instructions are not the equivalent of Holy Writ, they have been widely adopted and are eminently correct. *See, e.g., United States v. Alexander,* 743 F.2d 472, 478 (7th Cir.1984); *United States v. Feldman,* 711 F.2d 758, 765 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *United States v. Seymour,* 576 F.2d 1345, 1347–48 (9th Cir.), *cert. denied,* 439 U.S. 857, 99 S.Ct. 171, 58 L.Ed.2d 164 (1978). Moreover, both the Government and appellants based their requests to charge in large measure upon

Devitt and Blackmar, and so indicated to the district court.

Nowhere in appellants' principal brief or reply brief is there a contention that the district court erred in its charge to the jury. *See* Fed.R.App.P. 28(a)(4); *Sullivan v. Town of Salem*, 805 F.2d 81, 87 (2d Cir.1986); *Zuccarello v. Exxon Corp.*, 756 F.2d 402, 407–08 (5th Cir.1985); *United States v. Tamura*, 694 F.2d 591, 598 (9th Cir.1982). As a result, the correctness of the charge has not been briefed by the Government. Nonetheless, my colleagues have taken it upon themselves to find error. They say that "[t]o the extent that the charge permits the jury to find an intent to defraud based solely on the defendants' appropriation of a benefit to themselves, it is error." I find no such permission given in the charge. In the above-quoted portions of the charge, the district court listed three elements that the Government was required to prove, and the third of these was that the defendants acted "knowingly, with the intent to defraud." Since both the mail fraud and wire fraud statutes were involved, this charge was given twice. Indeed, when the jury came in for instructions, it was given a third time. On three occasions, the court told the jury that the defendant had to act "knowingly, with intent to defraud." The court charged the jury that "if ... any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

I have read the charge very carefully, and nowhere can I find any basis for the majority's statement that the court erred in charging the jury that "contemplated harm is *not* an element of fraudulent intent." The district court charged only that "[t]he mail fraud statute can be violated whether or not there's any loss or damage to the victim of a crime." There was nothing wrong with this. *See United States v. Margiotta, supra*, 688 F.2d at 121; *United States v. Von Barta*, 635 F.2d 999, 1005–06 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

The indictment charged, and the Government proved, that appellants, through false representations and the concealment of material facts, induced their customers to prepay postage money for mailing the customers' documents. The district court charged the jury without exception that "[a] material fact is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction." I take it as a given that every legitimate businessman wants to operate his business honestly and to avoid dealing with those who would do otherwise. I would like to think my colleagues would agree that, had appellants' customers known that appellants were thieves and embezzlers, who would pocket over 41 percent of the money advanced to them for postage, the customers would have taken their business elsewhere. *See United States v. Hasenstab, supra*, 575 F.2d at 1038. Appellants' scheme, which deprived their customers of the right to have their business conducted honestly, was a scheme to defraud. *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980).

Our decision in *United States v. Regent Office Supply Co., supra*, 421 F.2d 1174, is not to the contrary. *Regent* was a most unusual case in that it was tried upon stipulations of fact and admissions. The district court was asked to determine whether certain stipulated representations by the defendant's sales agent constituted mail fraud; *viz.*, that the agent had been referred by a friend of a customer or an officer of a corporate customer, or that the agent or a friend had stationery which had to be disposed of. *Id.* at 1176. "The reaction, if any, of any customers to the representations or the effect, if any, of such reaction on the commercial transactions was not revealed." *Id.* There was no evidence that any of the customers failed to receive merchandise of the quality promised. *Id.* at 1177. In viewing the paucity of proof, this Court said:

Without a fuller factual disclosure than here afforded, we are confronted with the proposition of simply declaring that any untrue statement designed to obtain the sympathetic ear of a potential cus-

tomer comes within the purview of the mail fraud statute. We believe it prudent to avoid this pitfall.

*Id.* at 1178. The Court then concluded: Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute a "scheme to defraud" or "obtaining money by false pretenses" within the prohibition of 18 U.S.C. § 1341? We hold that, as here presented, it does not and the convictions should be reversed.... But this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion.

*Id.* at 1179.

The instant case supplies the "different facts" and "more specific proof". Here, appellants' customers were deprived of their chance to bargain with facts material to the bargain before them. Here, in the language of *Regent Office Supply*, "fraud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Id.* at 1182.

In *United States v. London*, 753 F.2d 202 (2d Cir.1985), the indictment charged that the defendant and his cohorts devised a scheme "to obtain money by means of false and fraudulent pretenses, representations, and promises...." *Id.* at 206. Appellant in that case argued that the court's charge was inadequate because it failed to require a finding of contemplation of actual harm or injury before the jury could convict appellant of participating in the scheme with which he was charged. *Id.* at 205. Rejecting this argument, we said that there was nothing in the case of *United States v. Siegel, supra,* 717 F.2d 9, upon which appellant London relied, "to indicate that it is error for a court to fail to charge a jury with the specific language 'the prosecution must show that some harm or injury was contemplated by the scheme.'" *Id.* at 206. We also said, quoting *Regent Office Supply, supra,* that harm or injury

may be inferred "when the scheme has such effect as a necessary result of carrying it out." *Id.* Quoting again from *Regent Office Supply*, we said that "[w]here the false representations *are directed* to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Id.* (emphasis added in opinion). These statements are clearly applicable to the charge in the instant case.

## CONCLUSION

The Government's proof was overwhelming. Defense counsel conceded in summation that "the numbers and the statements that [the prosecutor] made ... about the postage shortage are all absolutely true." Defense counsel also told the district court at the close of proof:

They [appellants] do not argue with the Government's evidence that the post office received less postage than it was due. Nor do they argue with the evidence that while they owned the American Mailing Systems their employees buried higher rate mail within lower rate mail, and even dumped mail on occasion.

Although I have proceeded up to this point upon the same assumption which appellants' customers made—that all their mail went out—the fact of the matter, as appellants concede, is that some of the mail was dumped. On one occasion, approximately thirty bags of mail were destroyed. Figuring about 200 pieces of mail to a bag, this totals about 6,000 pieces. My colleagues, ignoring the fact that appellants' customers received no credit for either the destroyed mail or the unused postage, forgetting that Mr. Whitaker, the "dumper" of the mail, was a co-conspirator of appellants, and, paying only lip service to the requirement that all evidence with regard to the destruction of the mail must be construed in the light most favorable to the Government, blithely dismiss the destruction of the 6,000 pieces as unimportant.

There were other occasions when appellants cheated a customer without also

cheating the post office. Presorted first-class mail can be sent at a lower rate than unsorted. AMS presorted the mail without letting the client know that it had done so and pocketed the savings from the unsorted rate which the client had advanced. My colleagues call this a "legitimate" charge; I suggest that no hidden charge ever can be "legitimate". I point out also that an overcharge of $60 per month on a continuing basis, as here, adds up to the non-trivial sum of $720 per year. My colleagues pooh-pooh this as an indicia of fraud; I do not.

In all probability, the federal authorities would not have indicted appellants if the just described incidents of wrongdoing were all that were involved. However, as everyone, including my colleagues, concede, there is no doubt whatever that appellants secretly pocketed over $400,000 that had been entrusted to them for other purposes. Purely and simply, they embezzled it. *See* 2 LaFave and Scott, *Substantive Criminal Law* § 8.6 (1986); 13 Vt.Stat.Annot. § 2531 (1974). I believe this is exactly the type of wrongdoing the mail fraud statute was designed to prevent. I regret that this Court is now holding otherwise.

### ADDENDUM

Judge Newman's concurring opinion was not received until after the above dissent was written. Because Judge Newman's comments highlight in a few words the differences that separate the majority and the dissent, they merit comment.

These differences inhere in the analogy which the concurring opinion attempts to draw between the United States Post Office and "the supplier of printed forms", "the landlord", "the telephone company", or appellants' other "trade creditors". The third party to appellants' scam was not some unidentified "trade creditor" of appellants but was instead the United States Government, to whom appellants' customers owed both allegiance and postage. The analogy takes no cognizance of the undisputed fact that appellants conned their customers into entrusting them with the customers' postage money, which appellants specifically undertook and agreed to trans-

mit to the post office. The concurrence does not deny that appellants owed a fiduciary obligation with regard to the postage funds thus entrusted to them. The concurrence does not, and indeed cannot, challenge the dissent's assertion that appellants embezzled their customers' funds. The concurrence overlooks the undisputed facts that appellants hid their misappropriations from their customers by sending them false statements of mailing, certified with a sealing stamp which had been stolen from the post office. Finally, the concurrence does not dispute the possibility that appellants' customers might be held liable for the unpaid postage. In short, Judge Newman seems to be discussing an entirely different case than the one presently before us.

Simplification of the issues is always a result to be desired. I suggest, however, that the issue whether appellants were guilty of mail and wire fraud can be more accurately resolved by reference to three short statements of undisputed fact.

1. Appellants' customers entrusted appellants with the customers' postage money, which appellants kept separate and apart from their own funds and which they undertook and agreed to transmit to the post office.

2. Until the postage money was delivered to the post office, it remained the property of appellants' customers.

3. Appellants did not deliver all of the customers' funds to the post office as they had agreed to do, but, instead, stole, or in Judge Meskill's words "appropriated", over $400,000 of those funds.

I submit that appellants did not receive absolution from the embezzlement of their customers' money by stuffing and burying higher postage rate mail under lower postage rate mail so as to conceal the evidence of their thefts.